THE HARRIS BANKING COMPANY v. HELEN A. MILLER, Interpleader; and WILLIAM JOHNSON and JAMES E. DAVIS, Executors, Appellants.

Division Two, October 25, 1905.

1. **STAKEHOLDER: Certificate of Deposit: Equitable Jurisdiction.** Where a bank is a mere stakeholder of money left with it on time deposit, claiming no right in it, it can bring suit in a court of equity to compel the rival claimants thereto to interplead for it, thereby avoiding vexatious suits.

2. **GIFT INTER VIVOS: Intention: Delivery: Express Trust.** To constitute a valid gift *inter vivos*, there must be not only an intention to give, but a delivery to the donee or to some one for him of the property given; and in order to constitute delivery the donor must part absolutely with the present and future dominion and control over the property. Hence, where a donor deposited money in a bank and took a certificate of deposit and assigned that certificate to his housekeeper and stated he want-

ed her to have the money and asked the president of the bank to keep it, and on his refusal took it to his home, showed it to her, and said, "Now this is yours, but I want to use it while I live," and placed it in his pocketbook and put the book in his shirt and had it sewed in, and it was there at his death, his only purpose seeming to be to draw the interest on it while he lived, the principal to be hers after his death, there was no such delivery as constitutes a gift *inter vivos*. Nevertheless, her right to the corpus of the gift may be enforced as an express trust, since at the time he deposited the money in the bank he said it belonged to her, and directed the bank to pay it to her alone.

3. **EXPRESS TRUST: Created by Parol.** In the absence of a statute to the contrary, the owner of personal property may establish a trust therein by parol. When he orally or in writing explicitly or impliedly declares that he holds personal property for another, he thereby constitutes himself an express trustee. So that where the holder of money deposited it in a bank and took a certificate of deposit therefor in his own name and wrote thereon an assignment thereof to his housekeeper, and declared at the time that the money belonged to her and directed the bank to pay it to her and no one else, he thereby created an express trust in her favor which was executed in his lifetime, and which a court of equity will enforce after his death, although he kept the certificate during his lifetime, and stated to her that he did so in order that he might use the interest while he lived. [Following Lane v. Ewing, 31 Mo. 86. Also distinguishing Mount Calvary Church v. Albers, 174 Mo. 331, and State ex rel. v. Hawes, 174 Mo. 360, and overruling the point in both wherein it is stated that an express trust in personal property cannot be created by parol.]

4. ———: **Statute: Similarity to English Statute.** Our statute in reference to express trusts, section 3416, Revised Statutes 1899, is to all intents and purposes identical with sections 7 and 9 of the English Statute of Frauds of 29 Charles II. By its terms personal chattels are not included in it. An express trust in personal property may be created by parol and established by parol evidence.

5. ———: **Gift Inter Vivos: Antagonistic.** It does not follow because a party cannot establish a perfect gift *inter vivos*, that he may not show a valid executed express trust in his favor and have it enforced. If it was intended to be a gift *inter vivos*, it cannot be shown to be a valid executed trust. But if it was intended to be a trust, it does not follow that it cannot be shown to be such simply because it was not a gift *inter vivos* perfected by a delivery during the life of the donor.

Vol 190 mo—41

6. ———: ———: **Pleading and Evidence in the Alternative.** The petition of the interpleader set up a claim to the personal property as a gift *inter vivos*, and the reply averred that an express trust therein had been created in her favor, and evidence was offered in the alternative to sustain her right to the property, the case being one in equity. *Held*, that there was sufficient assertion of a trust to authorize a court of equity to determine whether or not an executed trust was declared.

7. ———: **Voluntary.** If a complete valid executed trust is established it will be enforced, nothwithstanding it is voluntary.

8. ———: **Words by Which Declared.** No particular words are necessary to declare a trust. If the language expresses an intention to create a trust, that is sufficient. The trustor by declaring himself a trustee of the property for those for whom he intends to provide, may create the trust.

9. ———: ———: **Unequivocal Declaration: The Interest Transferred.** An unequivocal declaration that the property is set aside for and belongs to another, as effectually passes the equitable title to such other, as delivery passes the legal title to the donee of a gift *inter vivos*.

10. ———: ———: ———: **This Case.** The deceased made a time deposit in a bank and at the time asked the president and cashier how he could "fix the deposit so that Helen A. Miller could be the absolute owner of the money and draw it at his death, and so that the bank could pay it to no one else," and was told to assign the certificate of deposit to her by an indorsement, and the cashier wrote this indorsement: "For value received I hereby assign this certificate to Helen A. Miller and authorize her to draw the same," and the deceased signed it. He took the certificate home with him, showed it to Mrs. Miller, and said, "Now that is yours, but I want the use of it while I live," and to her and others he stated that he wanted the interest on the fund while he lived, but that the fund itself was hers and that he wished her to have it at his death, and he kept the certificate in his possession while he lived. *Held*, that these statements and acts did not amount to a mere voluntary executory agreement to execute a trust, but to an unequivocal declaration that he held the legal title to the fund as trustee for Mrs. Miller, and, hence, the equitable title passed to her at the time he made the deposit, and the trust was complete.

11. ———: **When Executed.** An unequivocal declaration creating a trust accompanied by acts indicating that the trustor has done all he can to execute it, so that nothing remains to be done to effectuate his intention, creates an executed trust.

12. ———: ———: **Retention of Beneficial Interest.** The fact that the trustor retains a beneficial interest in the property for his

lifetime, for instance, that he reserves for himself the interest on a time deposit which he has made for another, does not make the trust in the fund itself any the less executed.

13. **EQUITY: Appellate Practice: Correct Decree, But Wrong Theory.** The appellate court, in an equity case, will affirm the judgment, notwithstanding the reason on which it was based may be disapproved. So that where the trial court held that the evidence showed a gift of a time deposit certificate to the interpleader and decreed the fund represented thereby to her, which cannot be upheld because there was no delivery, yet if the evidence clearly shows the creation of an executed trust in the fund for her, and the pleadings justify a decree sustaining the trust, the judgment will be affirmed.

Appeal from Putnam Circuit Court.—*Hon. P. C. Stepp,* Judge.

AFFIRMED.

*T. B. Davis, Higbee & Mills, Robison & Robison* and *N. A. Franklin* for appellants.

(1) This is an equitable proceeding. Miller v. Ins. Co., 68 Mo. App. 19. (2) The court erred in its conclusions of law. Neither the indorsement of the certificate nor any other fact in evidence warranted the conclusion that Burlinggame held it in trust for Mrs. Miller, or that said deposit belonged to Mrs. Miller or was held in trust for her by said bank or said Burlinggame. If Burlinggame showed said certificate to her and told her it was hers or would be hers at his death, but that he would retain it to collect the interest while he lived, there was neither an absolute delivery nor acceptance; there could be no joint possession of donor and donee; the gift did not go into effect at once and completely, but was at most a gift *in futuro.* It was a mere gift by words and not by actual transfer. There was neither a complete gift or trust shown by the evidence. Young v. Young, 80 N. Y. 430; Doty v. Wilson, 47 N. Y. 580; Gallaher v. Donahy, 69 Pac. 330; Funston v. Twining, 202 Pa. 88. (3) Mrs. Miller claims this

certificate in her petition as an executed gift; that Burlinggame gave, indorsed and assigned it to her. In her answer to the petition of the executors she claims that Burlinggame deposited the money in the bank in trust for her. On the trial she claimed that Burlinggame held the certificate for her. The court found all three propositions in her favor. These contentions are antagonistic. If Burlinggame became a trustee for Mrs. Miller, the possession of the certificate and the title thereto remained in him; in that case there was no delivery or completed gift. If there was a perfect gift, then there must have been an absolute delivery and acceptance, and no trust was created. He could not have intended a gift and a trust at the same time. Mrs. Miller declares upon a gift. She can have no relief upon the theory of a trust. She must stand or fall upon her petition. Young v. Young, 80 N. Y. 436; Wadd v. Hazelton, 137 N. Y. 215; Williams v. Chamberlain, 165 Ill. 210; Flanders v. Blandy, 45 Ohio St. 108; 1 Perry on Trusts (5 Ed.), secs. 96 and 97, note a, pp. 98-100. (4) A court of equity cannot render a gift perfect which the donor left incomplete, and cannot convert an imperfect gift into a declaration of trust, merely on account of that imperfection. It is claimed Burlinggame told the cashier "he wanted this, as he had previously instructed, so that Mrs. Miller could draw it at the time of his death," and he was advised to assign the certificate. It is clear, then, the purpose was to transfer the fund by assignment of the certificate, and not by the creation of a trust. The donor having failed to complete the gift, a court of equity cannot give effect to it by construing it as a trust, for then every imperfect gift or transfer would be made effectual by being converted into a trust. Flanders v. Blandy, 45 Ohio St. 108; Pitts v. Weakley, 155 Mo. 134; Wadd v. Hazelton, 137 N. Y. 215; Williams v. Chamberlain, 165 Ill. 210; Antrobus v. Smith, 12 Ves. Jr. 39. (5)   The settlement was to be

accomplished by gift; by an assignment of the certificate. It being voluntary, the indorsement of the assignment upon the certificate cannot be construed into a declaration of trust. "The making a man a trustee involves an intention to become a trustee." Burlinggame never expressed an intention to hold the certificate in trust for Mrs. Miller; he held it to collect his interest while he might live. He held it in his own right. He could not be trustee and *cestui que trust* at the same time. He may have thought Mrs. Miller would take it at his death, but that is speculation. The evidence shows he was considering a plan to give the certificate to Mrs. Miller to care for his brother Miles, and sister Mrs. Titus, which he expected to have matured by the following September. "There is a *locus penitentiae* as long as it is incomplete." Young v. Young, 80 N. Y. 438; Antrobus v. Smith, 12 Ves. Jr. 39; Flanders v. Blandy, 45 Ohio St. 115.

*Wilson & Clapp* and *A. W. Mullins* for respondent.

The facts in this case show that the deposit made by Giles Burlinggame in the bank of the Harris Banking Company was placed there to be held by the bank in trust for Mrs. Helen A. Miller, the respondent, and to be paid by the bank to her. The transaction by Burlinggame with the bank officers, the issuing of the certificate of deposit, and the written assignment indorsed on the certificate and signed by Burlinggame at the time, and his declarations to the officers of the bank then made by him, conclusively establish the fact that there was a completed trust created in favor of Mrs. Miller as to said deposit. 1 Perry on Trusts (5 Ed.), sec. 86; Martin v. Frink, Adm'r, 75 N. Y. 134; In re Estate of Soulard, 141 Mo. 662; Gerrish v. New Bedford Institution for Savings, 128 Mass. 159; Alger, Adm'r, v. Bank, 146 Mass. 418; Smith & Barber, Exrs., v. Darby, 39 Md. 268; Savings Institution v. Titcomb, 96 Me. 62;

Savings Institution v. Hathorn, 88 Me. 122; Roach v. Caraffa, 85 Cal. 436; Ray v. Simmons, Adm'r, 11 R. I. 266; Estate of Gaffney, 146 Pa. St. 49; Brooke's Appeal, 109 Pa. St. 188; Atkinson, Petitioner, 16 R. I. 413; Hellman v. McWilliams, 70 Cal. 449. The subject-matter being personalty, the trust may be created without any writing, but by oral declaration alone. 28 Am. and Eng. Ency. Law (2 Ed.), 870; In re Estate of Soulard, 141 Mo. 662; Lane v. Ewing, 31 Mo. 75; Roach v. Caraffa, 85 Cal. 436; Hon, Ex'r, v. Hon, 70 Ind. 137. A voluntary perfected trust may be enforced in equity, and is irrevocable. 28 Am. and Eng. Ency. Law (2 Ed.), 889; Atkinson, Petitioner, 16 R. I. 413. There was no reservation made by Burlinggame as to any use or enjoyment of the fund he had deposited in the bank. at the time the trust was created in favor of Mrs. Miller; but if he had declared that he would hold the certificate and collect the interest on it, that would not affect the validity of the trust. Savings Institution v. Hathorn, 88 Me. 122; Savings Institution v. Titcomb, 96 Me. 62; In re Estate of Soulard, 141 Mo. 663. Where a trust has been once perfectly created with an intelligent comprehension of the nature of the act, it is irrevocable, even though it be voluntary, and subsequent acts of the settlor or the trustee cannot affect it. 28 Am. and Eng. Ency. Law (2 Ed.), 899; Hellman v. McWilliams, 70 Cal. 449; Light v. Scott, 88 Ill. 239; Smith & Barber, Ex'rs, v. Darby, 39 Mo. 268; Willis v. Smyth, 91 N. Y. 297. To make the trust complete and effectual a delivery of the certificate of deposit was not necessary, but, if delivered, it was a present gift; "for the characteristic difference is that a gift transfers the whole title, legal as well as equitable, to the donee, while a trust is created by the transfer to the *cestui que trust* of the equitable title only, and to effect this delivery is not essential." 28 Am. and Eng. Ency. Law (2 Ed.),

906; Savings Institution v. Hathorn, 88 Me. 122; Atkinson, Petitioner, 16 R. I. 413.

GANTT, J.—On July 25, 1901, Giles Burlinggame of Putnam county, Missouri, died testate, at said county, and on July —— —, 1901, his will was duly probated, and letters testamentary were issued to the defendants William Johnson and James E. Davis, who were duly qualified and are acting as such executors of said estate.

On August 26, 1902, The Harris Banking Company filed its petition in the circuit court of Putnam county, stating that it was and still is a banking corporation with its banking house in the town of Harris, Sullivan county, Missouri; that for several years prior to his death, said Burlinggame had kept a considerable sum of money upon deposit in plaintiff's bank, bearing interest; that on May 22, 1901, plaintiff issued to said deceased a certificate of deposit for $8,080.91, which was dated June 11, 1901, and which said Burlinggame on said May 22, 1901, by written indorsement, assigned to Helen A. Miller; that plaintiff is informed and believes said Burlinggame delivered said certificate of deposit to said Helen A. Miller soon after said assignment and before his death; that plaintiff is informed and believes that said certificate of deposit was in the possession of said Burlinggame at the time of his death, and whether he held the same for himself or for Helen A. Miller, plaintiff does not know. That said Helen A. Miller claimed same as her absolute property, but said executors inventoried same as the assets of the estate of said Burlinggame, and refused to deliver it to her; that said executors on the one hand, and the said Helen A. Miller on the other hand, are now each demanding plaintiff to allow amount due on said certificate of deposit, and are threatening to sue the plaintiff if the sum is not paid to each of them respectively in full. That

plaintiff is ready and willing to pay the amount due on said certificate of deposit to the party legally entitled thereto, or to pay the sum into court for such party as shall be adjudged entitled to the same; that it would be unsafe for plaintiff to pay the sum to either claimant without its being judicially determined to which of the claimants it should be rightfully paid, and prayed that said Helen A. Miller and the said executors be required to interplead, setting up their respective claims to said certificate in order that it might be judicially determined to whom plaintiff should pay the sum, and for all proper relief.

At the October term of said court, 1902, Helen A. Miller filed her interplea, alleging that she was the owner and rightfully entitled to the said certificate of deposit and the fund evidenced thereby, and that the said Giles Burlinggame had no right, title or interest therein. That on or about the ———— day of ————, 1894, at the special solicitation of the said Giles Burlinggame, said Helen A. Miller moved from her home at Springfield, Missouri, to the residence of said Giles Burlinggame and his twin brother, Miles Burlinggame, both of whom were old and infirm, living alone, both being bachelors and her cousins, and undertook to keep house, wait on and nurse them. That said Miles was then and has continued to be without means of support and was living off the bounty of his brother, the said Giles Burlinggame, and that solely at the solicitation of said Giles Burlinggame she entered upon the work, service and duties she had so assumed, and from that date continued in the discharge of the duties in keeping house, waiting on and nursing said Burlinggame until the death of said Giles Burlinggame on July 25, 1901. That in recognition of the kindness she had so shown said Giles Burlinggame and his brother, and because of the work and the labor so performed and the care and the attention she had bestowed upon said Burlinggame

during all that period, the said Giles Burlinggame, having deposited in the plaintiff's bank the sum of $8,080.91, and having received the said certificate of deposit therefor from said bank, gave the same and the right to have and receive said money so on deposit to said Helen A. Miller, and indorsed and signed said certificate of deposit to her on May 22, 1901, and that certificate of deposit is now wrongfully withheld from her by said Johnson and Davis, executors of the will of said deceased, because they, as such executors, have no right thereto and no interest in said fund. Wherefore, she prays judgment for said sum of $8,080.91, and that the plaintiff bank be required to pay the same to her, and that the court will make such orders and render such judgment as may be proper.

On the same day Johnson and Davis, the executors, filed their petition as interpleaders, and admitted that they were the executors of the last will and testament of Giles Burlinggame, deceased, and alleged that said banking company duly issued its certificate of deposit to said deceased on date June 11, 1901, for the sum of $8,080.91, bearing three per cent interest to maturity only; that said certificate ever afterwards remained the property of said Burlinggame, and was his property at his death, and that said money was due from said banking company to said Burlinggame, with all interest thereon, and was wholly unpaid at his death and was a part of the assets of his estate. That said certificate was duly taken possession of by them as executors of the last will of said deceased, and duly inventoried by them as assets of said estate and they are now the owners and holders thereof as such and said certificate and said sum of $8,080.91, with all interest, is now due, for which they pray judgment and that this court order the same paid to them and for all proper orders.

On January 13, 1903, Helen Miller filed her answer to the petition of said executors substantially as fol-

lows: That it is true that said executors were duly qualified and are now acting as such executors and that the deceased was a resident of Putnam county, at the date of his death, July 25, 1901; that said executors obtained possession of said certificate of deposit from her and afterwards improperly and wrongfully inventoried same as assets of said estate. Denies that said certificate of deposit was the property of said deceased at the time of his death, but avers that same was then her property and has been her property since the assignment thereof as alleged in her interplea; that upon making said deposit in said bank and making the assignment of said certificate to her on the back of same the said Giles Burlinggame declared to the officers in charge of said bank that the said certificate of deposit belonged to this interpleader, Helen A. Miller, and for said bank to pay the money evidenced by said certificate to her and to no other person, and then and thereby placed said funds in said bank and left the same therein in trust for the sole use and benefit of the said Helen A. Miller, and prayed judgment as asked in her interplea.

On the same day the executors filed their answer to the interplea of Helen A. Miller, and alleged that the deceased at his death had and held the said certificate of deposit for $8,080.91, and that these defendants have had and still have possession thereof ever since the death of said deceased, and deny all the other allegations in the petition of said Helen A. Miller and prayed judgment as in their interplea.

The cause was tried by the court without a jury, on January 13 and 14, 1903, upon the foregoing pleadings, and judgment was rendered for Helen A. Miller, interpleader, and the plaintiff bank was ordered and adjudged to pay said sum of $8,080.91 to her and the costs were adjudged against the executors, Johnson and Davis. Within due time the executors filed their mo-

tion for new trial and in arrest of judgment, which was overruled, and thereupon the executors in due form appealed to this court.

On the part of the interpleader, Helen A. Miller, the evidence was as follows:

Overton Harris testified that he resided at Harris, Missouri, was a farmer and banker; he knew Giles Burlinggame twenty-five or thirty years; he died in about one month after his last visit to our town on June 13, 1901. Witness was at the time of giving his evidence, and had been president of the Harris Banking Company for three years. At the time of his death Giles Burlinggame had $8,080.91 on deposit in the bank; he had been a depositor for several years. The certificate of deposit for $8,080.91 was drawing three per cent for twelve months. At the time he made this deposit Burlinggame told me and my son, Cliff Harris, the cashier of the bank, that he wanted to wind up his business, and asked us to fix this deposit so that Helen A. Miller could be the absolute owner of said property. We told him that he could make an indorsement on the back of it and sign it over to her. Cliff wrote the indorsement and handed the certificate to him, and Giles Burlinggame signed the same. He then said, this winds up my business with the exception of about $3,500 that he had on deposit in a Lucerne bank, which amount he expected to bring down and fix the same way that he had the $8,080.91; that he wanted her to have this last amount as well as the first he had given her. On June 13, 1901, he came back to Harris to our bank and brought $500. I asked him if he wanted a time certificate for it; he said no, that he would be down in a few days and bring the balance; he would then fix it as he did the other. He said for us to pay this to no one but Helen Miller. Just about a year before he made this deposit, his deposit he made at that time was $7,855.26. He told us at that time in case of his death that Helen Miller would come

to the bank for said amount, and upon identification to pay her the same, but at the last time of making the deposit, after signing the indorsement of the certificate, he told us then to pay it to no one but her. My son made the indorsement on the certificate, and he, Burlinggame, signed it and afterwards put it into his pocket. He said it belonged to Helen A. Miller. After stepping out of the bank, we sat down in front of the bank, Mr. Burlinggame taking his pocketbook out of his pocket and asked me if I would hold the certificate. I told him I would rather not. He then put the certificate back into his pocket. He told me at different times he wanted her to have it, that she had been keeping house for him for six or seven years and that he didn't want John, his brother, nor Phil Burlinggame's heirs, to have any of his estate. That his twin brother, Miles, that lived with him was wholly incompetent to manage his affairs, and that he had the utmost confidence in Mrs. Helen Miller of taking care of himself and his twin brother and his blind sister. He further said if his twin brother was to get hold of it, he being a drunkard, that they would soon get it away from him. He said that Phil Burlinggame's heirs he thought had been furnishing him some money now as he had come home several times drunk, and that he was going to fix his affairs so the parties furnishing him this money to get drunk on would have to lose it. On cross-examination he was asked: ''Q. Did you write this letter of June 11, 1901? A. I signed it. It was written at my dictation. At the time I wrote this letter, I had a chance to make a loan of $5,000, and as Mr. Burlinggame had told me a few weeks before he intended to bring the $3,500 down and make a time deposit of it to Helen Miller, as he had the other, I figured that in doing so we could carry the loan.'' Said letter read as follows:

HARRIS BANKING COMPANY,
Harris, Mo.,

June 11, 1901.

"Giles Burlinggame, Esq., Lucerne, Mo.

"Dear Sir: Regarding the matter we were talking about I wish you would come down this week if possible as we have a chance now to make a nice $5,000 loan on 1,000 acres of land. This is a loan we want to make and if we use your funds in making it we want to have them soon. I think now that I will have to be away from home next week, and if your health is good you had better come down this week. Please answer and let us know when you will be down. I will be at home all this week.

"Very truly yours,
"O. HARRIS."

C. R. Harris testified as follows: I reside at Harris, Missouri, and am a son of Overton Harris and cashier of the Harris Banking Company and have been for five years. He testified that Giles Burlinggame had been a depositor in their bank ever since he had been cashier; that he would come around about the first of June to collect his interest on his old certificate, and renew it, or make a new deposit. He came down on May 22, 1901, the certificate matured June 11; said he wanted to wind up his business; wanted to leave his money to Mrs. Miller; that he wanted to leave some more money in connection with his time certificate he was then carrying, plus the accrued interest. The other amount was about $3,500 he then had in the bank at Lucerne, his home bank. He would bring that down in small sums, to leave the impression he was loaning it. We arranged his new certificate upon his request, payable to himself, for $8,080.91, at three per cent for twelve months. He said he wanted this, as he had previously instructed us, so that Helen A. Miller could draw it at the time of his death; that he wanted her to have it, and asked how he

could fix the paper, and my father and myself suggest-
ed that he just assign it, like any other negotiable in-
strument, to her. I prepared the assignment and he
signed it. He said we were to pay it to no one else but
Helen A. Miller; that it was her property, as he had in-
structed us previously; he instructed us frequently.
The year before when he came to renew his deposit and
collect his interest, he told us he was getting old and
might die at any time; and that in case he did die Mrs.
Miller would present the certificate for payment; that
Mrs. Miller would visit Mrs. Titus (his sister) and Mrs.
Titus would identify her. Burlinggame then asked
Overton Harris, president of the bank, to hold the cer-
tificate for Mrs. Miller, and he declined and Burling-
game put the certificate back into his pocket.

Frank C. Miller testified he was a son of Mrs.
Helen A. Miller, interpleader; that some twelve years
before his mother went to live with Giles Burlinggame,
he had a conversation with Giles Burlinggame in which
the latter said to him, "I would like to have your moth-
er come and live with me, or in other words take care
of me; I am getting old, I will give her all I have; do
you think she would come?" I said, "I do not know,
but said I would write to her about it," and he said,
"all right, he wished I would." He said there were on-
ly two women in the world he cared anything about and
one of them was my mother. That was about all of the
conversation at that time. I wrote her the statement
he made to me. I suppose he was about sixty-five years
old at that time.

Thos. Scott testified: My name is Thomas Scott,
age 54 years, residence Wintersville, Sullivan county;
occupation farmer. I have known Giles Burlinggame
for ten years. I saw him at Harris the latter part of
May, 1901. I told him I had a life policy in the Wood-
men and had come to have it changed; and he said he
had come to get his business fixed up; that he got Cliff

Harris to write out a certificate for a little over $8,000;
that he was going to give it to his housekeeper, Mrs.
Miller; that she had been keeping house for him for
six or seven years, and I said that was more than I was
able to give mine. About three weeks later I saw him
at Harris again; I said, "Did you give her that money,
a little over $8,000?" and he said, "Yes, sir." "How
did she take it when you gave it to her?" He said it did
not surprise her at all as he had said he had told her
that he was going to give it to her before he got all his
business straightened up and was going home. In the
first conversation he said he got Cliff Harris to write
out the certificate of deposit and that he was going to
take it home and give it to her. · That's what he told me.
The next I asked him if he had given it to her and he
said, "Yes, sir."

Mrs. Miller also read in evidence a passage from
the inventory filed by the said executors, as follows:
"Certificate of deposit No. 132 issued by the Harris
Banking Company of date June 11, 1901, bearing in-
terest at the rate of three per cent per annum for the
sum of $8,080.91; interest due on the above to date
$40.60." In parenthesis: "(Above certificate indorsed
to Helen A. Miller.)" Also read in evidence said cer-
tificate, as follows: "$8,080.91. Harris Banking Com-
pany, Harris, Missouri, June 11, 1901. Giles Burling-
game has deposited in this bank eight thousand and
eighty dollars and ninety-one hundredths, subject to the
order of himself on the return of the certificate prop-
erly indorsed. C. B. Harris, Cashier. No. 132. This
certificate isn't subject to check, three per cent interest
to maturity only," and on the back the following in-
dorsement: "For value received I hereby assign this
certificate to Helen A. Miller, and authorize her to draw
the same. Giles Burlinggame."

S. S. Johnson, a tenant of Burlinggame, testified
that he saw him in June, 1901, about a week after Bur-

linggame had got back from Harris; told him he was getting old, he ought to have his business fixed up, and Burlinggame said he had it fixed up right here, and put his hand on his left breast. Witness could see the bulk of something there about the size of a bill book. Burlinggame said he aimed for Mrs. Miller to have the biggest part of it (his estate). That he wanted his brother Miles, and his blind sister, to be taken care of; that he had the papers fixed up, but he didn't aim to turn them over; that she (Mrs. Miller) might die first and leave him out or throw him out. That Mrs. Miller was to have the money in the bank after his death, and he the interest on it for his own support; that she was to draw it after his death, but he wanted the use of the money and the interest on it while he lived. The bulk of his property he would leave to Mrs. Miller; that he had already fixed it and mentioned as having it in his pocket.

Charles Burlinggame, nephew of the deceased, testified he was at his uncle's a few days before his death; he had something like a little book, wrapped up in a piece of leather and he was very weak and tried to sew that into his bosom. Mrs. Miller offered to help him and he said if he wanted any help he would ask for it. I was there the day the executors got the papers. Mrs. Miller said they came and got Giles's papers and that there was a certificate of deposit for $500 among them and she gave it to them. She did not mention the $8,000 certificate.

A. H. Lowry testified: I was at Burlinggame's the morning he died. A few minutes before he died Mrs. Miller said for me to take charge of the papers in his shirt pocket and give them to her; that was Burlinggame's request. She said there was a paper in there that really belonged to her; that he had showed it to her, but that he wanted to keep it in his possession to draw the interest on it. I don't know whether she said it was a paper or a certificate. I went and got Uncle Billy Wil-

son, and amongst us we took the papers off.  As I remember the book it was a kind of leather slip, and it was in his shirt pocket; they seemed to be stitched in with some kind of thread or twine. Mr. Wilson took the book out of his pocket and handed it to Mrs. Miller. She did not open it or say anything at the time. I was at the inventory. Mrs. Miller said Burlinggame showed her this certificate of deposit and said that he wanted to keep it; that he might want to draw the interest on it; that he wanted to retain it so that he could get the interest on it.

James E. Davis, executor, testified he was at the inventory; that Mrs. Miller said that when Burlinggame came from Harris he showed her the certificate of deposit, and my impression is that he told her that at his death it was hers.  That he would keep it and draw the interest while he lived.  There was a will and some notes and a memorandum of deposit of $500 in that book.  They were all inventoried.  I believe I heard Mrs. Miller say something about the paper being hers, hers at his death. I think she said that he would keep it until his death and he would draw the interest.  She said that he had shown it to her when he came from Harris and said that it was hers at his death, but that he would keep it until his death and draw the interest.

William Johnson, one of the executors, testified that he was sent for, and Mrs. Miller got the papers; she said they were on Mr. Burlinggame's body.  She named about them being pinned on or sewed on his shirt or on his breast, and says that he said that he would keep them right there.  A day or two afterwards we went back to get the papers.  Mrs. Miller handed them to Mr. Currey and he opened the papers and this certificate was among them.  She said he was giving her that to take care of Miles, that certificate she was claiming; that he was afraid if Miles got it into his possession at his death these other brothers and folks would get the

Vol 190 mo—42

proceeds from Miles. She said he expected to get it all arranged by the first of September following, this arrangement in regard to Miles, giving her the certificate, and would get all arranged by September. She said that was the package as it came off Mr. Burlinggame's body. She never claimed it was hers; she said it ought to be hers.

Dr. Parish testified: I was at Burlinggame's the night he died. He was very sick and kept holding his hand on his left breast. I asked him if anything was hurting him and I thought he mentioned his money. I noticed a bulk in his shirt and it looked like it was sewed in. After his death I asked Mrs. Miller what had become of those papers and she said we called in some parties and took them off.

In rebuttal, William Wilson, a witness for Mrs. Miller, testified, that Mrs. Miller said that when Burlinggame came home from Harris he took out that certificate and handed it to her and told her he wanted her to read it, and he said, "Now that is yours, but I want the use of it while I live." I was at Burlinggame's directly after his death and found a bundle of papers sewed up in his shirt pocket. I ripped the pocket open and took the papers out. I didn't notice the papers; they were tied up with a twine string, solid, all in a bunch, and I handed them to Lowry and he handed them to Mrs. Miller and told her to put them away, and she put them in her trunk. After the burial she asked me to open the package—she did not want to hold it. I found the two certificates, one for $8,080.91 and one for $500, some notes payable to Burlinggame, and the will, and about $95 in cash. And she said that Burlinggame had them in his pocket while he lived and had her sew them in. She said that he wanted her to wear them on her person and she did not like to do it; that he put them in his pocket when she did not want to take them and put them in there and had her sew them in, and I came in while she was sewing them in and saw her sewing them.

I. This is an equitable proceeding by the plaintiff banking company, as a stakeholder, seeking the protection of a court of equity against rival claimants to the certificate of deposit issued by it. As the plaintiff is in the position of a mere stakeholder, claiming no right in the subject-matter, but being liable to be vexed by two or more suits by the different claimants of the said certificate at the same time, the jurisdiction of equity is well established. [2 Story's Equity Jurisprudence, secs. 806, 821; Hathaway v. Foy, 40 Mo. 540.]

The issue is a simple one, to-wit, who is the rightful owner of the said certificate, Mrs. Helen A. Miller on the one hand, or the executors of the last will of Giles Burlinggame, deceased, on the other hand? The facts are few and not complicated. It is not disputable that the deposit of $8,080.91 in the plaintiff bank of date June 11, 1901, was originally made by the said Giles Burlinggame in his own name and a certificate of deposit issued directly to him. Mrs. Miller asserts title to the said certificate and the fund which it represents on two grounds: First, an executed gift *inter vivos,* and second, an executed parol trust created by Giles Burlinggame in her favor to the said fund. The executors insist that the gift was invalid for want of a delivery of the certificate after the assignment thereof on its back to Mrs. Miller, and that there was no evidence of any intention to create a trust in said fund in favor of Mrs. Miller. The learned circuit court made a special finding of facts and found that the evidence established a valid executed gift *inter vivos* from the said Burlinggame to Mrs. Miller, and that by his assignment of the deposit certificate to Mrs. Miller and his subsequent acts he had relinquished all control over the said certificate of deposit and held the same as the property of Mrs. Miller. The first inquiry, therefore, must be as to the propriety of this finding of the circuit court. The question is one of equity and the finding and conclusion of the circuit court is open to review by this court; and

while it has been the uniform practice of this court to defer in a large measure to the judgment of the circuit court on a question of fact, on account of its superior advantage in weighing the testimony of the witnesses, yet where the evidence is practically undisputed, as it is in this case, this court has never abdicated its right to weigh the testimony and draw its own conclusion as to the equitable rights of the parties litigant.

Addressing ourselves then to the question whether the facts developed on trial established a valid executed gift *inter vivos* from Giles Burlinggame to Mrs. Helen A. Miller, the testimony in our opinion establishes that Giles Burlinggame deposited $8,080.91 of his own money in plaintiff's bank on the 22nd day of May, 1901, and took a certificate of deposit therefor in his own name, and at the same time he indorsed on the back of said certificate the following words: "For value received I hereby assign this certificate to Helen A. Miller and authorize her to draw the same. Giles Burlinggame." And at the time of the execution of said assignment the said Giles Burlinggame directed the plaintiff banking company not to pay said deposit to any one else, but to pay the same to Helen A. Miller, and requested Overton Harris, the president of the said banking company, to hold the said certificate of deposit, but the said Harris declined to do so; that thereupon the said Burlinggame replaced said certificate in his pocket and returned to his home with it in his possession. As to what occurred between Giles Burlinggame and the interpleader, Mrs. Helen A. Miller, in regard to said certificate of deposit after his return to his home, Mrs. Miller was not competent to testify, and we are forced to accept the evidence as to her statements of what occurred by proof *aliunde.* It is conceded on all hands that when Giles Burlinggame died, this certificate of deposit, together with another for $500 and his will, were found on his person wrapped in a leather bag and sewed to his shirt, and was turned over to his executors by Mrs. Miller soon after his

death. Mrs. Miller told the witness Lowry while Bur-
linggame was *in articulo mortis* that it was Burling-
game's request that she should take charge of the pa-
pers in his shirt pocket; that there was a paper in there
that really belonged to her; that he, Burlinggame, had
showed it to her, but that he wanted to keep it in his
possession to draw the interest on it. He further testi-
fied that he was present at the making of the inventory,
and on that occasion Mrs. Miller said that Burlinggame
showed her this certificate of deposit, but said that he
wanted to keep it; that he might want to draw the inter-
est on it; that he wanted to retain it so that he could get
the interest on it.

James E. Davis, one of the executors, testified that
he was present at the making of the inventory, and Mrs.
Miller said that when Burlinggame came from Harris
he showed her the certificate of deposit, and his impres-
sion was that he told her that at his death it was hers;
that he would keep it and draw the interest while he
lived.

William Johnson, the other executor, testified, that
he was sent for after Burlinggame's death, and Mrs.
Miller got the papers and turned them over to him; he
said they were on Mr. Burlinggame's body when he
died, pinned on or sewed on his shirt, and said that he
said that he would keep them right there; that when he
opened the package the certificate in controversy was
among them.

William Wilson testified that Mrs. Miller said that
when Mr. Johnson, the executor, came down there and
got the papers, Mrs. Miller asked if he thought he ought
to take the certificate that was signed over to her, but
he said that as it was found among the other papers he
thought he ought to take it to Unionville with him, but
that he thought it ought to be sent back to her; that Mrs.
Miller said that when Mr. Burlinggame came back from
Harris he took out that certificate and handed it to her
to read it and said, "Now that is yours, but I want to

use it while I live.'' Mr. Wilson further testified that after the burial of Mr. Burlinggame, Mrs. Miller requested him to open the bundle or package of papers, and he found this certificate among other papers in it; that Mrs. Miller said to him that Mr. Burlinggame had them in his pocket while he lived, and she sewed them in; that he wanted her to take them and wear them on her person and she did not like to do it.

Mr. Clifton R. Harris testified that at the time the certificate of deposit was issued, Mr. Burlinggame said he wanted this fixed so that Helen A. Miller could draw it at the time of his death.

That Giles Burlinggame intended to give Mrs. Helen A. Miller the certificate of deposit or rather the fund which it represented at some time does not admit of doubt. ''Courts are ever desirous of carrying out and effectuating the intention of parties as manifested by their agreements or declarations of trust, and will do so whenever it can be done consistently with the established rules of law. To constitute a valid gift *inter vivos*, there must be an intention to give and a delivery to the donee, or to someone for him, of the property given. An intention of the donor to give is not alone sufficient; the intention must be executed by a complete and unconditional delivery. Neither will a delivery be sufficient unless made with an intention to give. The transaction must show a completely executed transfer to the donee of the present right of property and the possession. The donee must become the owner of the property given. [Dunn v. Bank, 109 Mo. 97; McCord v. McCord, 77 Mo. 166; Walter v. Ford, 74 Mo. 195; Tomlinson v. Ellison, 104 Mo. 105.] A gift cannot be made to take effect in the future. Such a transaction would only amount to a promise to make a gift in the future, and being without consideration is void. [Spencer v. Vance, 57 Mo. 429; School District v. Sheidley, 138 Mo. 672.]'' [In re Estate of Soulard, 141 Mo. l. c. 657.]

In view of these well-settled principles of law can

it be said that Giles Burlinggame made an unconditional gift and delivery of the certificate of deposit in this case to Mrs. Miller? While we think it is plain from his conversation with the Messrs. Harris at the time of the execution of the certificate of deposit by them that it was his intention to give Mrs. Miller this fund, and while the assignment fully corroborates their testimony as to the intention which he expressed at the time, the physical fact that Giles Burlinggame retained this certificate of deposit in his own possession until his death, stands admitted and conceded; not only this, but the claim asserted by Mrs. Miller to the executors and to the witnesses who were present at the time of Mr. Burlinggame's death falls short of a claim that Mr. Burlinggame had parted absolutely with the present and future dominion and right of control over the certificate of deposit. Her evidence falls short of a statement of an unconditional delivery to her; on the contrary, she says that he showed it to her and permitted her to read it, but said he wanted to keep it in his possession to draw the interest on it; that it would be hers at his death, but he would keep it and draw the interest while he lived. Her own witness, William Wilson, says that she told him that Mr. Burlinggame handed the certificate to her and told her that he wanted her to read it and said, "Now that is yours, but I want the use of it while I live." We cannot escape the conclusion that this evidence does not establish a valid executed gift *inter vivos*. In our opinion the retention by the deceased of the actual possession of the certificate of deposit with the expressed intention of reserving to himself the right to collect and retain the interest accruing thereon, negatives the claim of an unconditional gift. The authorities above cited from this court are supported by numerous others and by the great weight of authority both in England and in the United States.

II. Notwithstanding the conclusion we have reach-
that the transaction by Giles Burlinggame cannot be

enforced as an executed gift *inter vivos,* her contention that it can be enforced as an executed express trust in her favor remains to be determined. In her defense to the interplea of the executors she asserts that at the time he deposited said fund in said bank, said Burlingame declared to the officers of said bank that said certificate belonged to interpleader Helen A. Miller, and directed said bank to pay the money evidenced by said certificate to her alone and no one else, and thereby placed the same in said bank in trust for the sole use and benefit of said interpleader, Helen A. Miller. To this claim of an executed trust objections are made by counsel for the executors. It is first insisted that the claim of executed trust cannot be maintained for the reason that it must have been evidenced by a writing and cannot be established by parol evidence.

Mr. Perry in his learned and exhaustive treatise on Trusts, in the first volume, section 86, thus states the doctrine: "There does not seem to be any objection to the establishment of a trust in personal property by parol. The owner in the absence of a statute has entire control of it; he can sell and transfer it without writing and by parol, and if he can transfer it by parol, there is no reason why he may not by parol transfer it upon such lawful terms, and to such uses and trusts, as he may desire. It has been so ruled in express decisions in the United States. When a person *sui juris* orally or in writing explicitly or impliedly declares that he holds personal property for another, he thereby constitutes himself an express trustee." Section 3416, Revised Statutes 1899, in force at the date of the making of the deposit and the assignment of the certificate therefor, in this case, is to all intents and purposes identical with sections 7 and 9 of the English Statute of Frauds of 29 Charles II.

By its terms personal chattels are not included within it and such has been the uniform judicial construction of these sections in our sister states. [Gilman

v. McArdle, 99 N. Y. l. c. 456, 457; Thacher v. Church-ill, 118 Mass l. c. 110; Patterson v. Mills, 69 Iowa 758; Cobb v. Knight, 74 Me. l. c. 257; Danser v. Warwick, 33 N. J. Eq. l. c. 135, 136; Roach v. Caraffa, 85 Cal. l. c. 445.]

The English cases fully sustain this view. [Ben-bow v. Townsend, 1 M. & K. 506; Jones v. Lock, 1 L. R. Ch. App. Cas. 25.]

Such unquestionably was the opinion of this court in Lane v. Ewing, 31 Mo. 86. But we are cited to two decisions of this court holding that an express trust cannot be created by parol under section 3416, Revised Statutes 1899: Mount Calvary Church v. Albers, 174 Mo. 331, and State ex rel. v. Hawes, 177 Mo. 360.

The announcement of this rule in Mt. Calvary Church v. Albers, supra, was predicated on the decisions in Rogers v. Ramey, 137 Mo. 598, and Woodford v. Stephens, 51 Mo. 448.

A careful reading of both decisions will demonstrate that neither supports the proposition that an express trust as to personal property cannot be created by parol. Each of said cases involved a claim of trust to real estate alone and of course the language used had reference alone to the subject-matter, to-wit, real estate. The statement in State ex rel. v. Hawes is based upon Mt. Calvary Church v. Albers. The writer, who is responsible for the statement in the Hawes case, is convinced that this statement of the law as to the creation of a trust in personalty is opposed by the unbroken line of authority in England and in the United States, and has no hesitancy in taking this first opportunity of confessing his error. He is still of opinion that Church v. Albers and State ex rel. v. Hawes were both correctly ruled on all other points and that it was not necessary to have announced that a trust in personalty could not be created by parol. We think those cases are in conflict with the earlier decisions in Lane v. Ewing, 31 Mo. 86, and Huetteman v. Viesselmann, 48 Mo. App. 582.

In the latter case it was conceded by both parties that a trust in respect to personalty need not be proved by a writing, and such we are satisfied is the general understanding of the bar of this State.

Accordingly we hold that the objection that the trust, if any, in favor of Mrs. Helen A. Miller, cannot be established by parol evidence is not tenable, and we must decline to follow the rulings to the contrary in Church v. Albers, 174 Mo. 331, and State ex rel. v. Hawes, 177 Mo. 360.

But it is further urged that this assertion of a trust is antagonistic to the claim of an executed gift *inter vivos,* and we are cited to the language of the Court of Appeals of New York in Young v. Young, 80 N. Y. 437, approved in In re Soulard's Estate, 141 Mo. 659, to the effect that "it is well settled that equity will not interpose to perfect a defective gift or voluntary settlement made without consideration. If legally made, it will be upheld, but it must stand as made, or not at all. When, therefore, it is found that the gift, which the deceased attempted to make, failed to take effect, for want of a delivery or a sufficient transfer, and it is sought to supply this defect and carry out the intent of the donor by declaring a trust which he did not himself declare, we are encountered by the rule above referred to. It is established as unquestionable law that a court of equity cannot by its authority render that gift perfect which the donor has left imperfect, and cannot convert an imperfect gift into a declaration of trust, merely on account of that imperfection."

Conceding and agreeing to this statement, it does not follow that, because a party is not able to establish a perfect gift *inter vivos,* he or she may not show a perfect valid trust and have it enforced. The decision in Soulard's case is a complete refutation of such a position. In that case it was ruled there was no valid gift, and yet it was held that a valid express trust had been created and it was enforced. Judge MACFARLANE, speak-

ing for this court, said: "As has been said, the trans-
action in question does not amount to a perfect gift.
That is evident from the terms of the settlements them-
selves. Yet it is evident that the donor intended to
make a complete disposition of the property, by which
the income should be paid to himself during life; the
proceeds of the notes, when paid, should be reinvested
under his direction, the beneficiaries should have no
power to dispose of the principal during his life, but at
his death they should have the principal fund abso-
lutely, whether then in bonds, notes or money. We must
assume that the donor intended to do what these settle-
ments show he attempted to do. If the settlements, to-
gether with what was done under them, amounted to a
valid executed trust, then they should be carried out in
favor of the beneficiaries."

In Savings Institution v. Titcomb, 96 Me. 62, the
case was one of interpleader in equity, just as in the suit
at bar, and the interpleader set up a gift *inter vivos* sub-
ject to a parol trust for his children, or if not a gift,
then a trust created by the donor in favor of inter-
pleader's children. The Supreme Court of Maine held,
as this court did in Soulard's case, that the evidence
did not establish a valid gift *inter vivos*, but that it did
sustain a valid executed trust and enforced it. The
court said: "It still remains to inquire whether he cre-
ated a valid trust. We think he did. It is true if the
transaction was intended as a gift *in praesenti*, but was
imperfect, as for want of delivery, a trust cannot now
be substituted for the gift. If it was intended to be a
gift *inter vivos*, whether it was perfect or imperfect, it
was not a trust. [Norway Savings Bank v. Merriam,
88 Me. 146.] *On the other hand, if the transaction was
not intended to be a gift,* it might constitute a trust."

The pleadings of Mrs. Miller in this case are tanta-
mount to the pleading of the interpleader in Savings
Institution v. Titcomb, and the evidence was offered to
sustain her right to the deposit in the alternative. The

cause was and is one in equity, and as a court of equity we think there was sufficient assertion of a trust to justify the circuit court and this court in determining whether there was an executed trust in her favor to the deposit in controversy, and, if so, to enforce it in her favor.

We recur then to the main proposition in this case, and that is, did the evidence establish an executed parol trust as to this certificate of deposit for the benefit of Mrs. Miller?

If a complete valid executed trust is established it will be enforced notwithstanding it is purely voluntary. [Leeper v. Taylor, 111 Mo. l. c. 324; Pomeroy's Eq. Jur. (2 Ed.), secs. 996, 997.]

In In re Estate of Soulard, 141 Mo. 660, it is said that it is well settled law that no particular words are necessary to declare a trust. If the language sufficiently expresses an intention to create a trust, that will be sufficient. This is recognized by all the authorities. [Perry on Trusts, sec. 82.]

The donor or trustor may accomplish this result "by actually transferring the property to the persons for whom he intended to provide and the provisions will then be effectual, and it will be equally effectual if he transfers the property to a trustee for the purpose of the settlement, or if he declares himself a trustee for those purposes."

Giving full credence to the witnesses who testified to the statements of Mrs. Miller as to what occurred between Mr. Burlinggame and herself on his return from Harris with the certificate of deposit in his pocket and the assignment indorsed thereon, together with the testimony of the Messrs. Harris, we think no other rational conclusion can be drawn, than that Mr. Burlinggame intended that Mrs. Miller should have the fund represented by the certificate of deposit at his death. This is made entirely clear by his consulting Overton Harris as to the method he should pursue, to use his

own language, "so that Helen A. Miller could be the absolute owner of said property," and "that in case of his death she could come to the bank for said amount and upon identification the bank was to pay her the same and to pay it to no one but her." By the execution of the assignment on the certificate, he further evidenced his intention. Had he delivered her the certificate thus indorsed, no doubt could exist that it would have been a perfect gift of this fund *inter vivos,* but his retention of the certificate and his expressed intention to her that he desired to keep it and draw the interest on it during his lifetime, negatived the idea of a gift *in praesenti.* He did not intend to divest himself of all beneficial interest in the deposit. He then had two purposes in view, one to secure to her the amount of the deposit after his death, and the other to retain for himself the interest on it during his lifetime. Moreover, he notified both his debtor, the Harris bank, and the beneficiary of the trust, Mrs. Miller, that he had thus constituted himself a trustee for these purposes. In unequivocal terms he told Mrs. Miller and the Messrs. Harris that this fund was set aside for Mrs. Miller at his death. In Savings Institution v. Titcomb, 96 Me. 69, it is said: "The creation of a trust is but the gift of the equitable interest. An unequivocal declaration as effectually passes the equitable title to the *cestui que trust,* as delivery passes the legal title to the donee of a gift *inter vivos.* One may constitute himself a trustee by mere declaration." [Bath Savings Institution v. Hathorn, 88 Me. 122; Ibid, 32 L. R. A. 377.]

In the case at bar there were both deposit and declaration. By this statement we are not to be understood as holding that a voluntary executory agreement to create a trust could be enforced, but that where there is a declaration of an executed trust after the donor had done all he could so that nothing remained to be done, then the trust was executed. Looking at the substance of things, not mere forms, we are constrained to hold

this was a valid execution of a trust as to this fund for Mrs. Miller. In Soulard's case, 141 Mo. 663, it was said: "It is true, he retained a beneficial interest in the property, the right during his life to the interest and income therefrom, and reserved the right to direct the reinvestment of the proceeds. But these are parts of the declared purposes of the trust. The trustee could as well make the income payable to himself for life as to any other party." In Stone v. Hackett, 12 Gray 227, the income of the property was to be paid to the donor during life and upon his death the principal was to be divided among various charities and the validity of the trust was upheld. In Davis v. Ney, 125 Mass. 590, a voluntary trust was sustained which allowed the donor to receive, not only the income, but such part of the principal as she might need during her life. "Three things, it has been said, must concur to raise a trust: Sufficient words to create it, a definite subject and a definite object; and to these requisites may be added another, viz., that the terms of the trust be sufficiently declared." [Bispham's Eq. (7 Ed.), sec. 65.]

In this case the deceased donor said to Mrs. Miller after showing her the certificate duly assigned to her and after she had read it: "Now that is yours, but I want the use of it while I live." This statement is fully corroborated by the testimony of the Messrs. Harris as to his inquiry how he could make it her absolute property, and when advised to accept a certificate and then indorse it to her, he did so and then and there directed them not to pay it to anyone else. This was not a mere executory promise, but considered altogether was a declaration of a trust in favor of Mrs. Miller in the present tense, and doubtless considered by Giles Burlinggame as a completed transaction, inasmuch as when it was done and his directions given to his bankers to pay it to no one else, he said that it was her property, not that he intended to give it to her, but it was now hers, subject only to the right in himself to receive the

interest thereon. He further declared that he was winding up his business and he unquestionably regarded that as to this fund he had made a final disposition of it by creating a trust of which he himself was the trustee for Mrs. Miller.

In Gerrish v. New Bedford Institution, 128 Mass. 1. c. 161, it was said: "There is in the case at bar no formal written declaration. But no particular form of words is required to create a trust in another, or to make the party himself a trustee for the benefit of another. It is enough for the latter purpose if it be unequivocally declared in writing, or orally if the property be personal, that it is held in trust for the person named. [Ex parte Pye, 18 Ves. Ch. 140; Wheatley v. Purr, 1 Keen 551; M'Fadden v. Jenkyns, 1 Hare 458; Milroy v. Lord, 4 De G., F. & J. 264.] When the trust is thus created, it is effectual to transfer the beneficial interest, and operates as a gift perfected by delivery." In that case the court commented upon the effect of notice to the donee, and said: "Notice to the donee is indeed not necessary when other acts or declarations of the donor are sufficient and complete in themselves; but when the transaction is capable of two interpretations and the settlement is merely voluntary, it is plain that notice given by the donor to the donee of the existence of the trust would, in most cases, be decisive on the question of intention. It takes the place of that delivery which is necessary to perfect a gift of personal property. It is not only satisfactory evidence of an executed intention, but it is a declaration in the nature of an act necessary to complete the transaction and create the trust." In this case the donor not only gave notice to the donee and announced to her, in view of the deposit and the assignment in writing to her, that it was hers, and that he was holding it for her until his death, but he went further and notified the bankers who owed the deposit that it was her absolute property and not to pay it to any one but her.

In view of the able and exhaustive discussion of the law applicable to this class of cases in the Soulard case, 141 Mo. 642, it seems a work of supererogation to extend this opinion further by the citation of precedents. In our opinion the facts of this case establish a clear executed parol trust by Giles Burlinggame in favor of Mrs. Miller to the deposit of $8,080.91, represented by the certificate of deposit issued by The Harris Banking Company to Giles Burlinggame, and by him assigned to Mrs. Miller. This trust was a clear recognition of the debt of gratitude which the donor owed to Mrs. Miller for the invaluable services which she had rendered him and his twin brother in his old age when he had no wife nor children or other near relative to minister to his wants. As already said, that it was his intention that she should have this fund, does not admit of a reasonable doubt. And in our opinion his acts and declarations to secure it to her by creating a trust in her favor of which he was the trustee himself were amply sufficient to meet all the requirements of the law, and in carrying out and effectuating his intention no violence or injustice has been done any other person.

While in our opinion the circuit court erred in holding it a valid gift *inter vivos,* all the facts are before us as a court of equity, and the judgment and decree of the circuit court is affirmed, notwithstanding the reason upon which it is based is not approved.

All concur.