# A. A. ROLLESTONE v. NATIONAL BANK OF COMMERCE IN ST. LOUIS et al., Executors of Will of JOHN T. MILLIKEN, Appellants.

### Division One, June 8, 1923.

1. **TRUST: Execution: Completely Declared: Owner of Stock as Trustee.** Where the owner of corporate stock selects himself as trustee for another, a mere declaration to that effect and of the uses upon which as trustee he holds the stock is all that is necessary to effect a complete trust.

2. ———: **Owner of Stock as Trustee: Complete Execution.** Deceased was the owner of 595,000 shares of mining stock of the par value of one dollar each. Plaintiff was treasurer of the company, but did not own any of the stock. Their relations were intimate and confidential. The testator purchased an additional six hundred thousand shares at seventy-five cents per share, which gave him control of the company, and plaintiff aided him in borrowing money to make the purchase. Shortly afterwards he said to plaintiff that he wanted "to carry him for a block of this stock" and that he could have whatever amount he wanted at seventy-five cents per share. A few days later he wrote plaintiff that there was considerable of the stock on the market at seventy-seven cents, and that he would go in with him and buy all that was offered at that price. To this plaintiff replied he would wait before buying the market stock "on joint account," but that if deceased would increase his holdings to thirty thousand shares for wh'ch he had offered to carry him, he would like that much. To that deceased rep'ied that he did not then see his way clear to let him have more of the stock than he had agreed to carry him for, "namely, 10,000 shares." Later he stated he was "carrying" pla'ntiff "now for ten thousand shares of capital stock at seventy-five cents." *Held*, that these declarations constituted a completely declared trust of the ten thousand shares, and made deceased as trustee, upon a sale of them by him, liable to account to plaintiff for the amount he received for them, and the dividends dec'ared and collected by him before the sale, less seventy-five cents per share.

3. ———: ———: **Particular Shares: No Certificate.** Where the owner of over a million shares of the capital stock of a certain corporation, all of the same par value and series and all alike, declared that he was "carrying ten thousand shares of the capital stock" for plaintiff at seventy-five cents per share, it is of no consequence

that no certificate was issued for them or that no particular por-
tion of the stock was set apart for plaintiff. The ten thousand
shares, like ten thousand bushels of wheat of a bulk of a million
bushels, were sufficiently distinctly ascertained.

4. ————: ————: Terms: Executory Agreement. Where the evidence
clearly establishes that deceased as trustee was carrying plaintiff
for ten thousand shares of stock at seventy-five cents per share,
to be paid for either by plaintiff himself or out of the proceeds
of sale when the stock was sold, the declarations of deceased did
not amount to a mere executory agreement, or to a mere promise to
give plaintiff the dividends and profits on re-sale, but the terms
of the trust were sufficiently declared and became fixed when such
declarations were made. Having orally and in writing explicitly
declared that he held the ten thousand shares *in praesenti* for plain-
tiff, such declarations constituted him a trustee of the stock in
an express trust for plaintiff, and from that time forward the bene-
ficial interest in the stock is to be considered as vested in plain-
tiff, and he is entitled to the aid of a court of equity to enforce
the trust.

5. ————: Sufficient Testimony. Adhering to the rule that the
testimony to establish an express trust must be cogent and con-
vincing, it is *held* that, although the proof that deceased declared
he was carrying plaintiff for ten thousand shares of stock at
seventy-five cents rests upon the testimony of one witness, said
testimony was sufficient. Nor is the trustworthiness of said wit-
ness impaired by the fact that he was in December discharged by
deceased as cashier of his bank after he had already requested
to be relieved in January, nor by the fact that he voluntarily
came from a distant state to testify for plaintiff instead of giv-
ing his deposition, nor by the fact that such declaration was made
fifteen years previously, nor was his testimony loose and casual.

6. ————: Laches: Silence. Laches in legal significance is not mere
delay, but delay that works to the disadvantage of another. De-
ceased in 1906 declared he was carrying plaintiff at seventy-five
cents per share for ten thousand of six hundred thousand shares
of mining stock which plaintiff had aided him to buy, and it is
manifest that it was his purpose to retain control of plaintiff's
shares until he could dispose of the whole six hundred thousand
shares; in 1912 an attorney for plaintiff wrote him a letter whose
recitals disclose that its real purpose was to obtain from him an
express acknowledgment of plaintiff's ownership of the stock, and
threatened suit only if he denied the rights therein claimed by
plaintiff; he made no such denial and did not answer the letter;
he sold all the stock in 1915 at $2.66 a share, and died in 1919,
without ever having accounted to plaintiff for any part of the

proceeds of the sale or any dividends, which from 1910 to 1915 were from three to ninety-four per cent of par value; it does not appear when plaintiff learned of his death or the sale of the stock. *Held, first,* that the silence of deceased, after receiving the attorney's letter, was not such an unequivocal repudiation of the trust as required immediate action on plaintiff's part; *second,* that his death put his estate at some disadvantage, but was not such a material change in the situation as justifies a denial of equitable relief; and, *third,* plaintiff's silent acquiescence in deceased's drawing and appropriating the dividends and his delay in bringing his suit after deceased had failed to answer his attorney's letter, did not amount to laches, and plaintiff's suit to establish the trust and for an accounting, brought against the executors within the period of limitations, is not barred by laches.

Appeal from St. Louis City Circuit Court.—*Hon. Granville Hogan,* Judge.

AFFIRMED.

*Irvin V. Barth, Forest P. Tralles* and *Watts, Gentry & Lee* for appellants.

(1)   If all the evidence offered were admitted to be true it would afford no basis for the decree entered by the trial court.   The evidence offered is not sufficient to establish an executed trust, which must be established before plaintiff can recover, there being no consideration, pleaded or proven, for the alleged promise by Milliken.   (a) The statements by Mr: Milliken, in his letters of May 17, 1906, and June 16, 1906, constitute, at best, a mere promise to hold in trust, in the future, not an executed trust.   As agreements such statements constitute at best a mere *nudum pactum.*   As declarations of trust they are wholly insufficient, for they are mere promises to do something in the future.   It is not sufficient in such a case for the alleged trustee to express a purpose to hold money or property in trust at a future time.   The promise must have reference to an act *in praesenti* and not *in futuro.* 39 Cyc. 65, 66; Marble Co. v. Mattice, 22 Colo. 647; Mackay v. Burns, 16 Colo. App.

6; Mize v. Miller, 60 Mo. App. 58; Pomeroy on Equity Jurisdiction, sec. 997; Banking Co. v. Miller, 190 Mo. 669-670; Watson v. Payne, 143 Mo. App. 728; Bank v. McKenna, 168 Mo. App. 254; Gartside v. Pohlman, 45 Mo. App. 164. (b) The evidence of an oral promise made early in 1906, to carry plaintiff for 10,000 shares of stock, is insufficient for the same reason. Besides, a mere oral promise to give or sell the stock or its proceeds to plaintiff would be within the Statute of Frauds. Bernhardt v. Walls, 29 Mo. App. 206. (c) There was no effectual declaration of trust shown in this case, because there is a total failure of any proof that Mr. Milliken had set apart any particular portion of the stock in question, to be held by him as trustee. There must be a specific *res* to which the trust can attach. Mr. Milliken had just bought 600,000 shares of stock. There is no evidence that he set aside any particular 10,000 shares for Mr. Rollestone, or that he ever promised to do so. No new certificate was taken out by him for this amount, nor did he ever designate, in any other manner, the shares that he intended to hold or carry for Mr. Rollestone. Lane v. Ewing, 31 Mo. 75; In re Estate of Soulard, 141 Mo. 642; Banking Co. v. Miller, 190 Mo. 640; Moulton v. Train, 199 Mo. App. 509. (d) The evidence wholly fails to establish an effectual declaration of trust because it does not show clearly the definite terms of the trust. All that it tends to show is that Mr. Milliken was to carry the plaintiff for 10,000 shares at the price of seventy-five cents per share. All the terms of the trust must be definitely and clearly shown before a court of equity will attempt to enforce such a trust. In re Estate of Soulard, 141 Mo. 642; 39 Cyc. 38, 39. (2) Even if plaintiff would be entitled to equitable relief upon clear proof of the allegations of his petition, the evidence wholly fails to establish a case which appeals to a court of equity. In such a case the evidence must be clear, forceful and convincing beyond all reasonable doubt. In re Estate of Soulard, 141 Mo. 642; Smith v. Smith, 201 Mo. 547;

Curd v. Brown, 148 Mo. 92-93; Foley v. Harrison, 233
Mo. 584. McDonald's evidence as to loose declarations
by the deceased, away back in 1906 or 1907, falls far
short of meeting the standard of proof demanded by a
court of equity. When carefully considered, McDon-
ald's evidence will be found untrue. This court will
weigh the oral evidence as if the trial were *de novo* here.
Turner v. Overall, 172 Mo. 271; Evans v. Evans, 176
Mo. 1; Barrett v. Ball, 101 Mo. App. 288; Richards v.
Pitts, 124 Mo. 602; Bleyer v. Bleyer, 219 Mo. 99. (3)
Plaintiff is barred from the right to equitable relief by
reason of his own laches. Equity will not lend its aid
to a person who has slept on his own rights, if he had
any, until the other party cannot be heard in opposition
to plaintiff's claim. Taylor v. Blair, 14 Mo. 437; Ste-
venson v. Saline County, 65 Mo. 429; Lenox v. Harrison,
88 Mo. 497; Rutter v. Carothers, 223 Mo. 640; Betzler v.
Clark, 227 Mo. 392; Bodd v. Wolff, 148 Mo. 335, 348;
Bliss v. Prichard, 67 Mo. 181.

*Judson, Green & Henry* for respondent.

(1) The oral and written declarations of John T.
Milliken, which were established by undisputed and in-
disputable evidence, are sufficient to constitute Milliken
trustee for Rollestone as to ten thousand shares of Gol-
den Cycle Mining Company stock which Milliken had
purchased at seventy-five cents per share and was then
carrying in his own name. 39 Cyc. 34, 57; Harris Bank-
ing Co. v. Miller, 190 Mo. 640, 1 L. R. A. (N. S.) 790;
Moulden v. Train, 199 Mo. App. 509; Mize v. Bates Coun-
ty Natl. Bank, 60 Mo. App. 358; Laughlin v. Laughlin,
237 S. W. 1024; Orr v. Union Trust Co., 236 S. W. 642;
In re Estate of Soulard, 141 Mo. 664; Tyler v. Tyler, 25
Ill. App. 333; Watson v. Payne, 143 Mo. App. 721. (a)
No particular language is necessary to create a trust
in personal property, and where the title to the prop-
erty involved is then in the donor any language is suffi-

cient which clearly indicates an intention to hold it for the benefit of a third person. Laughlin v. Laughlin, 237 S. W. 1024; Moulden v. Train, 199 Mo. App. 640; Tyler v. Tyler, 25 Ill. App. 533; Mann v. Urquhart, 89 Ark. 239; Hill on Trustees, p. 65. (b) The use of the word trust or trustee is not necessary. 39 Cyc. 57; Moulden v. Train, 199 Mo. App. 509; Laughlin v. Laughlin, 237 S. W. 1024; Watson v. Payne, 143 Mo. App. 721; Huetteman v. Viesselman, 48 Mo. App. 582. (c) An agreement to "carry" for another stock or bonds, which the declarant holds in his own name, has a well-defined significance, and such agreements or declarations, in equity, constitute the declarant a trustee of the property in question. Mann v. Urquhart, 89 Ark. 239; Price v. Dover, 40 Md. 102; Richardson v. Shaw, 209 U. S. 365, 52 L. Ed. 835. (d) It was not necessary that there should be any physical separation of the ten thousand shares allotted to Milliken by the issuance of a separate certificate therefor in order to establish an enforcible trust therein, because the declaration of trust itself clearly and expressly specified the extent of Rolletone's interest in the entire six hundred shares of stock which Milliken had just purchased. Mann v. Urquhart, 89 Ark. 239; Price v. Dover, 40 Md. 102; Corpus Juris 544; Richardson v. Shaw, 209 U. S. 365, 52 L. Ed. 835. (e) The Statute of Frauds has no application to a declaration of trust as to personal property. Harris Banking Co. v. Miller, 190 Mo. 640, 1 L. R. A. (N. S.) 790; Laughlin v. Laughlin, 237 S. W. 1024. (2) A valid trust in personal property may be created by parol. Harris Banking Co. v. Miller, 190 Mo. 640, 1 L. R. A. (N. S.) 790; Moulden v. Train, 199 Mo. App. 509; Laughlin v. Laughlin, 237 S. W. 1024. In the case at bar we have not only the oral declarations testified to by McDonald, which are sufficient of themselves to establish the trust, but we have also Milliken's own letter to Rollestone, in which he admits that he has agreed to carry ten thousand shares of the Golden Cycle Mining stock last purchased by him

as trustee for Rollestone. So that this particular trust was established both by the oral and the written declarations of the donor. (3) The language testified to by witness McDonald, as well as that contained in Milliken's letter, shows a completely executed trust already established, with the donor acting as trustee, and not a mere promise to establish such a trust in the future. Watson v. Payne, 143 Mo. App. 721; Tyler v. Tyler, 25 Ill. App. 333. Milliken's declaration to McDonald in 1907 was, not that he would at some future time buy and carry ten thousand shares of this stock for Rollestone, but it was, "I am now carrying Rollestone for ten thousand shares of this stock, at seventy-five cents per share, and that will make him a fortune." (4) There is certainty about the terms of the trust, which were that ten thousand of the share then standing in Milliken's name were to be "carried" by him for Rollestone at seventy-five cents per share until Milliken could sell or dispose of them at a satisfactory price, and when disposed of by Milliken he was to pay over to Rollestone all profits realized on these ten thousand shares, over and above the purchase price of seventy-five cents per share. Huetteman v. Viesselman, 48 Mo. App. 588; Watson v. Payne, 143 Mo. App. 721; Moulden v. Train, 199 Mo. App. 509; Laughlin v. Laughlin, 237 S. W. 1024. (5) The doctrine of laches does not bar relief in this case. (a) Laches is a species of estoppel and applies only where the delay warrants the belief that plaintiff has abandoned his claim. Condit v. Maxwell, 142 Mo. 277; Schnadski v. Albright, 93 Mo. 48; St. Louis Safe Dep. Bk. v. Kennett Est., 101 Mo. App. 397. (b) Mere delay in bringing suit if short of the Statute of Limitations does not constitute laches in an equity case. Summers v. Abernathy, 234 Mo. 156; Hudson v. Cahoon, 193 Mo. 547; Meriwether v. Overly, 228 Mo. 242; Cantwell v. Crawley, 188 Mo. 45; Wendell v. Ozark Orchard Co., 200 S. W. 747; Locke v. Bowman, 168 Mo. App. 121. (c) Especially where the claim was definitely asserted and

everything short of bringing suit was resorted to. Wendell v. Orchard Co., 200 S. W. 749; Lumber Co. v. Iron Co., 101 Mich. 577; Pearson v. Treadwell, 179 Mass. 462; Young v. Railroad Co., 28 Wis. 171. In cases of express trusts limitation or laches cannot be invoked to bar the beneficiary until there is an open repudiation of the trust, and clear and unequivocal acts or assertions of adverse title by the trustee brought to the knowledge of the beneficiary. Pomeroy on Equity (4 Ed.) sec. 1449 (28); Perry on Trusts (6 Ed.) secs. 863 and 864; 39 Cyc. 603; Murry v. King, 153 Mo. App. 710; Condit v. Maxwell, 142 Mo. 266; Johnson v. United Rys. Co., 243 Mo. 296; Moulton v. Train, 199 Mo. App. 509; Keeton v. Keeton, 20 Mo. 530. (d) Inasmuch as a written demand was made upon Mr. Milliken in 1912, long prior to his death, for an accounting for this stock, and he was at that time fully informed of the claim and advised that plaintiff would insist upon enforcing it, defendants cannot now claim they were damaged by the delay in bringing this suit, and unless there is some damage caused by a delay of this kind the doctrine of laches does not apply, even though the trustee may have died. Summers v. Abernathy, 234 Mo. 156; Hudson v. Cahoon, 193 Mo. 563. The death of other party is not of itself sufficient to enable defendants to invoke defense of laches. O'Day v. Annex Realty Co., 191 S. W. 41; Locke v. Bowman, 168 Mo. App. 121, 151 S. W. 468.

RAGLAND, J.—This is an action in equity to enforce a trust in personal property and compel an accounting. The defendants are the executors of the will of John T. Milliken, deceased.

The petition alleged that "in the early part of 1906, the said Milliken stated to plaintiff that he would set apart and carry as trustee for plaintiff, until such time as it could be resold, 10,000 shares of the said 600,000 shares of the stock so purchased at seventy-five cents per share as aforesaid, and would pay plaintiff the dividends and profits therefrom, plaintiff to repay the said Milliken

the purchase price of seventy-five cents per share out of the dividends or out of the proceeds of sale thereof.'' It next set out in full two letters, hereinafter quoted at length, one of which was written by Milliken. This part of the petition, by intendment at least, amounted to an averment that Milliken declared that he was carrying Rollestone for 10,000 shares of stock as he had agreed. It next alleged that Milliken received certain dividends on the 10,000 shares; that he sold the stock on or about March 1, 1915, at four dollars per share; that no part of the proceeds of the sale of the stock ''so held by Milliken as trustee for plaintiff, and no part of the said dividends so received by said Milliken as trustee for plaintiff, as aforesaid, were paid over to him by said Milliken, or by the defendants, his executors,'' but that said sums had been mingled by Milliken with his own property and assets and were then in the possession of his executors as part of the asset of his estate. The prayer was for the enforcement of the trust and for an accounting.

The answer was a general denial and pleas of the five-year Statute of Limitation, the ten-year statute, and laches.

The evidence on the part of plaintiff tended to establish the following facts:

On January 1st, 1906, the Golden Cycle Mining Company, a corporation, with a capital stock of one million five hundred thousand dollars divided into shares of the par value of one dollar each, was operating a gold mine at Cripple Creek, Colorado. John T. Milliken was its president, and owned 595,000 shares of its capital stock. Plaintiff, Rollestone, was treasurer, but did not own any of its stock. He was also cashier and vice-president of the bank of Victor at Victor, Colorado. Milliken was also president of the Milliken-Helm Commission Company of St. Louis. He was a man of great wealth, but was still pursuing with zest the fascinating game of piling up additional millions. Among other activities he

299 Mo.—5.

was extensively engaged in speculating in mines and in oil and mineral lands and leases. Colorado afforded in part the field of his operations, and here many of his most important transactions were effected through Rollestone or with his assistance. With respect to such matters their relations were intimate and confidential.

In January, 1906, Milliken, with the assistance of Rollestone, purchased an additional six hundred thousand shares of the capital stock of the Golden Cycle Mining Company at the price of seventy-five cents per share. This purchase gave him control of the company, and eliminated a rival faction which had been trying to obtain the control. Shortly after the acquisition of the additional stock by Milliken he said to plaintiff in substance:

"Rollestone, you have been better to me than a brother; I want to carry you for a block of this stock. Now you can have whatever amount you want at what I paid for it, seventy-five cents per share."

This statement was made in the Bank of Victor and in the presence of T. C. McDonald who was assistant cashier of the bank and also assistant to Rollestone as treasurer of the Golden Cycle Mining Company. In these capacities he was present at many of the conferences between Milliken and Rollestone. In reply to Milliken's offer to carry a block of the stock for him Rollestone said he would accept 10,000 shares of it.

Soon after the conversation at the Bank of Victor just referred to, the following letters were exchanged between Milliken and Rollestone:

"St. Louis, Mo., May 17, 1906.
"A. A. Rollestone, Esq.,
    Victor, Colo.
"Dear Mr. Rollestone:
    "There is some Cycle stock on the market. My friend Carter here bought, 3,000 shares yesterday, and my bookkeeper, Miss Ellicott, bought 1,000 shares the day before, a'l at 77 cents.
    "I will go in with you on joint account and buy all that is offered at that price, because I am satisfied that the stock is worth par and that we will realize twice that much out of it when I get through with my present plans.
                        "Yours very truly, JNO. T. MILLIKEN."

Rollestone v. National Bank of Commerce.

"June 13, 1906.

"John T. Milliken, Esq.,
322 Pine Street,
    St. Louis, Mo.
"Dear Mr. Milliken:

"I have been over to Routt County for the past ten days, and on my return, found your letter of the 6th, telling me to mail Mr. Logan a check for six months' interest, which I have done today. My recollection is that the rate of interest is eight per cent.

"I also received your recent letter, regarding the buying up of Golden Cycle stock which is now on the market, on joint account. As you are going to be in Colorado before long, I think it best to wait until you can come out, and we will map out a plan. I have been thinking about your offer to carry me for a block of Golden Cycle Stock, and if, out of the last purchase, you will increase my holdings to thirty thousand shares, I should like it. However, if this is too much, kindly let me know, as I do not wish to press the limit in any way.

"Thanking you for your kindness, I remain,
            "Yours very truly, A. A. ROLLESTONE, Cashier."

"St. Louis, Mo., June 16, 1906.

"A. A. Rollestone, Esq.,
    Victor, Colorado.
"My dear Mr. Rollestone:

"Your letter of the 13th inst. at hand, contents fully noted. I expect to be out some time the latter part of this month.

"I do not see my way clear now to let you have more Cycle stock than I agreed to carry you for, namely, 10,000 shares, but I will join you in joint account in buying up the floating stock as stated in a previous letter; however, I do not think there is any hurry about doing so until we know what is at 12,000 feet. If we open the ore there I am well satisfied that I can market the mine and mill on the New York market for at least five millions of dollars. You see what the U. S. R. & P. common and preferred stock is selling for, also their bonds are bringing $102.00. We will have a mill that will be $1.50 a ton better than any property they own, and the Cycle mine is another asset.

"I believe that our property will be worth more than theirs, and I feel confident that I will ultimately be able to unload the whole outfit at the price above mentioned.
            "Yours very truly, JNO. T. MILLIKEN."

In the summer or early fall of 1907, a little more than a year after the letters just quoted were written, Milliken was at Colorado Springs. In the course of a conversation which took place between him and McDonald at that time and place, with reference to some leases, Milliken said: "Mr. McDonald, I want you to make some money out of these leases, and I want you and Rollestone to make some money, especially Rollestone. I am carrying him now for ten thousand shares of capital stock at seventy-five cents that will make him a fortune."

Milliken seems never to have disposed of any of the Golden Cycle Mining stock that he acquired from time to time until March 11, 1915, when he sold his entire holdings, amounting at that time to 1,431,623 shares, at $2.66 2/3 per share. He received dividends on the stock from 1910 to 1915 inclusive, ranging from three per cent to ninety-four per cent of the par value.

From many letters written by Milliken to Rollestone from 1906 to 1911 it abundantly appears that the cordial relation between the two remained unbroken during that time and that Milliken was all the while availing himself of Rollestone's services in the capacity of confidential agent. During the summer of 1911, however, Milliken, who had also acquired control of the Bank of Victor, discharged Rollestone from the services of both the bank and the mining company. What prompted Milliken to dismiss Rollestone from these positions is not disclosed by the record. The latter when let out was wholly without means. He first went to Denver where he remained a time; he next made a trip to Europe, and then to South Africa. Returning to this country after a year or so, he went to Oklahoma seeking to get into the oil business. He was residing there at the time he instituted this suit.

On October 1, 1912, one E. J. Boughton as attorney for plaintiff wrote Milliken the following letter:

"Cripple Creek, Colo., Oct. 1, 1912.

"John T. Milliken, Esq.,
St. Louis, Mo.
"Dear Sir:

"Mr. A. A. Rollestone represents to us the following statement of facts:

"Early in the year of 1906 he was treasurer of the Golden Cycle Mining Company, of which you were then, as now, the president. At that time you had a controversy with certain minority shareholders represented by Mr. Carlton and Mr. Campbell, whose stock you desired to purchase at 75 cents a share. For this purpose you asked Mr. Rollestone to procure you a loan from the Golden Cycle treasury of $283,000. Mr. Rollestone arranged the loan for you and with the money you purchased the minority stock at the price mentioned, depositing the stock certificates thus acquired as security for the loan. Later the loan and securities were transferred to a bank in St. Louis. In consideration of Mr. Rollestone's services to you in this behalf you undertook to carry for Mr. Rollestone as many shares of the stock thus purchased as

Mr. Rollestone desired, at the purchase price of seventy-five cents per share. Mr. Rollestone indicated that he desired you to carry for him 10,000 shares of the stock, to which you agreed. On the 13th of June, 1906, Mr. Rollestone wrote to you requesting you to carry 25,000 shares for him instead of 10,000. You replied by letter over your signature, June 16, 1906, that you did not see your way clear to carry him for more than the 10,000 shares originally named by him and which you had agreed to carry him for. You added in this letter that you would, however, join him in buying up the floating stock, but that there was no hurry about that until you could find out what was at ten hundred feet. You went on to state that if ore was opened you thought you could market the mine and mill on the New York Market for $5.000,000, concluding, 'I feel confident that I will be able to unload the whole outfit at the price above mentioned.'

"Mr. Rollestone represents that since the date of the correspondence referred to the matter has rested. He now desires, however, to take up the 10,000 shares of stock, which you are holding for him as trustee under your agreement, together with the accumulated dividends thereon, from which, of course, you may subtract the original purchase price of seventy-five cents per share. In other words, Mr. Rollestone has requested us to make demand of you that you turn over to him 10,000 shares of the stock of the Golden Cycle Mining Company as per your agreement, together with the accumulated dividends thereon since the date of agreement, less the sum of $7,500, representing the original purchase price of the stock.

"Will you be kind enough to let us know as soon as possible what your intentions are with respect to a compliance with the request herein made, as in case of a refusal upon your part we are instructed to commence action immediately.

"If your desire a consultation in the near future either with Mr. Rollestone or with ourselves about the matter referred to herein, we will be very glad to accommodate you in that respect by calling upon you either here, at Colorado Springs or Denver if you are going to be in any of those places in the near future.

"Very sincerely yours, EDWARD J. BOUGHTON."

Milliken ignored the letter, and no further demand was made upon him for the stock or an accounting. The matter thus rested until his death, which occurred February 4, 1919. The assets of his estate according to the inventory filed in the probate court amounted to $7,155,-319.25.

No evidence was offered on the part of defendants.

The court found the issues for the plaintiff, and that upon an accounting there was due him the sum of $57,147.33½. Judgment was rendered accordingly and ordered certified to the probate court. Defendants bring the case here on appeal.

I.    (1) The first question presented on the record
is whether the declarations of Milliken constituted a
completely declared, that is, executed, trust with re-
spect to the 10,000 shares of the Golden Cycle Mining

Company's stock.   It is said that a trust is
Completely
Declared
Trust.
executed when the trustor has done every-
thing which could have been done, the char-
acter of the property comprising the trust
being considered, to transfer the property to the trustee
in such mode as will be effectual to pass title.   Where,
however, he selects himself as trustee, a mere declara-
tion to that effect and of the uses upon which as trustee
he holds the property is all that is necessary to effect
a completed trust.   [In re Soulard's Estate, 141 Mo.
642.]

Appellants insist that Milliken's statements, if in-
dicative of a trust at all, constitute nothing more than
a mere promise to hold in trust in the future.   His first
statement, that he would carry Rollestone for whatever
amount of the stock the latter wanted, it must be con-
ceded, was but an offer of future performance.   His
next statement with respect to the same subject-matter
was contained in his letter of June 16, 1906, as follows:
"I do not see my way clear to let you have any more
capital stock than I agreed to carry you for, namely,
10,000 shares."   This should be read in connection with
Rollestone's letter to which it was a reply, and in the
light of the facts and circumstances which were evi-
dently in the minds of both parties at the time.   Milli-
ken's offer in the first place was to carry Rollestone for
whatever amount of the stock he wanted, and in response
to that offer Rollestone had expressed a desire to be
carried for 10,000 shares.   When he wrote Milliken on
June 13, 1906, he referred to Milliken's original offer
and requested that his holdings be increased to 30,000
shares.   Now the evidence is explicit that he then had
no holdings at all unless Milliken was holding the 10,000
shares for him.   It is evident therefore that at least Rol-

lestone understood that Milliken was carrying him for 10,000 shares, and Milliken's statement in response to Rollestone's request for additional shares, while expressing in direct terms a refusal to grant the request, seems to imply that he was at that time carrying him for 10,000 shares as he had agreed to do. The third declaration by Milliken, the one made to McDonald in 1907, was plain and unequivocal: "I am carrying him [Rollestone] now for ten thousand shares of capital stock at seventy-five cents that will make him a fortune." From the three declarations it appears, therefore, that Milliken not only promised Rollestone that he *would* carry him for 10,000 shares of stock at seventy-five cents a share, but subsequently declared that he *was* so carrying him.

(2) It is next contended that as the evidence does not show that any particular portion of the stock was set apart for Rollestone and a certificate issued therefor, the alleged trust must fail for lack of a definitively ascertained subject. But it clearly appears from Milliken's statements that he was carrying Rollestone for 10,000 shares of the capital stock of the Golden Cycle Mining Company. Now Milliken at that time had more than a million shares standing in his name on the corporation's books, all of which were exactly alike in kind and value. There was no earmark by which any one of them could be distinguished from the others, so as to give it additional value or importance. They were like grain of a uniform quality, wherein one bushel is of the same kind and value as another. [Caswell v. Putnam, 120 N. Y. 153, 157.] The words "ten thousand shares of capital stock" embodied therefore an accurate description of definite property rights in the corporation. A certificate of the same number of shares would have evidenced nothing more. [Richardson v. Shaw, 209 U. S. 365.] Appellants' contention under this head is disallowed.

*Particular Shares.*

(3) It is further claimed by appellants that Milliken's statements were ineffectual to raise the trust al-

leged because the terms thereof were not sufficiently de-

**Terms.**     clared. It is argued that Milliken's statements amounted to nothing more than an executory agreement to sell Rollestone the stock on credit at seventy-five cents a share, or, possibly, to a promise to give him the dividends and profits, if any, that might be realized upon a re-sale. But his statement to McDonald in 1907, "I am now carrying him for ten thousand shares of capital stock at seventy-five cents," when considered in connection with his previous declarations and in the light of all the attending facts and circumstances, and particularly with reference to the fact that up to that time no stock had ever been transferred to Rollestone in such a way as to invest him with the legal title, must. be regarded as equivalent to his saying, "Ten thousand of the six hundred thousand shares of stock that I bought at seventy-five cents a share I hold for Rollestone and I am extending him credit for the money that I advanced to pay for them." In other words, it was a declaration on the part of Milliken that ten thousand shares of the stock were Rollestone's, subject to his own right to be reimbursed for what he had paid for them, either by Rollestone or out of the proceeds of the sale when the stock was sold. This was a sufficient declaration of a trust. "When a person *sui juris* orally or in writing explicitly or impliedly declares that he holds personal property *in præsenti* for another, such declaration constitutes him a trustee, in an express trust for such other, of the property, and in such case the beneficial interest in the property is considered as vested in the *cestui que trust*, and he is entitled to the aid of a court of chancery to enforce the trust." [Tyler v. Tyler, 25 Ill. App. 333, 339; 1 Perry on Trusts (6 Ed.) sec. 86.] Milliken having constituted himself a trustee with respect to the stock, it was not necessary in order for his declaration to have raised an enforcible trust that he should have further declared the duties that devolved upon him as such trustee which were implied by

law. By these implied terms of the trust he was bound, when it was terminated by a sale of the stock, to account to Rollestone for the proceeds of the sale and for the dividends he had received, after deducting the purchase price.

II. The proof that Milliken made in substance the oral statements heretofore set out, with reference to carrying Rollestone for 10,000 shares of the stock of the Golden Cycle Mining Company, rests solely in the testimony of the witness McDonald. Appellants strenuously urge that it lacks the cogent and convincing quality required in cases of this kind to establish a trust. In this connection they point out that McDonald was discharged as assistant cashier of the Bank of Victor by Milliken in 1911; that he voluntarily came from his home in Denver, Colorado, to· St. Louis, to testify for Rollestone in this case; and that after a lapse of nearly fifteen years he claimed to be able to recall the substance of statements made by Milliken with reference to a subject-matter in which he, the witness, had no interest. They further suggest that the testimony itself, so far as it has any bearing on the existence of a trust, was as to mere loose declarations. For all of these reasons, they say that the proof is not sufficient to support an affirmative finding with respect to what they characterize as an unusual and extraordinary transaction.

McDonald's testimony, including that given upon a rigid cross-examination, embodies a straight-forward narration of the occurrences with respect to which he testified. It involves no contradiction and evinces no characteristic that tends to cast suspicion upon the integrity of the witness. Nor do we regard any of the facts or circumstances disclosed by the testimony as having impaired McDonald's trustworthiness as a witness. The circumstances of his discharge as assistant cashier of the Bank of Victor were simply these: He notified Milliken in December that he would stay no longer than the first of the year and Milliken thereupon discharged

him.  He testified that he was not in the least disgruntled by Milliken's action because he was anxious to get away.  If he had in fact ever entertained an ill-feeling for Milliken there was not the slightest indication of it while he was on the witness stand, in either his language or his bearing.  That plaintiff was enabled to induce him to come to St. Louis and testify at the trial instead of giving his deposition at Denver is, in our opinion, without significance.

The statements to which McDonald testified cannot be characterized as "loose" or "casual."  Certainly those with respect to Milliken's offer to carry Rollestone for whatever amount of stock he wanted at seventy-five cents a share and the latter's acceptance of 10,000 shares would not fall within such category.  The later statement, according to the testimony, was made while McDonald was negotiating with Milliken for leases for himself and Rollestone.  While the subject of leases was under discussion, and in connection with the transaction then in hand, Milliken said: "McDonald, I want you to make some money out of these leases and I want you and Rollestone to make some money, especially Rollestone.  I am carrying him now for 10,000 shares of capital stock at seventy-five cents that will make him a fortune."  McDonald not only knew of Milliken's holdings in the Golden Cycle Mining Company and of the circumstances under which he acquired 600,000 shares of its stock, but was himself a business man and entirely familiar with the implications of Milliken's words that he was carrying Rollestone for 10,000 shares of the stock at seventy-five cents a share.  There is no reasonable probability, therefore, that he misunderstood him, or has misquoted his language, if he is telling the truth.  Nor is it remarkable that he is now able to recall the substance of the statement.  He was intimately associated in a business way with both Milliken and Rollestone at the time it was made and for a number of years afterward; he knew that after the breach between the two, Rollestone de-

manded the stock and Milliken failed to deliver it; and, as he says, "he wondered why."

The dividends and profits accruing from ten thousand of the shares of stock that Milliken purchased in 1906 and sold in 1915 exceeded $40,000. Viewed after the event, the assertion that he was during that period carrying Rollestone for that many shares at what it cost him would seem to betoken such generosity on Milliken's part as to be unbelievable. But it must be borne in mind that at the time Milliken offered to carry Rollestone for a block of the stock and at the time he stated that he was carrying him for 10,000 shares at seventy-five cents a share the investment was a speculation pure and simple. There were no certain assurances that losses would not be garnered rather than profits. In addition to that fact the business relations of the two men were close; Milliken, as disclosed by his letters, in connection with his own speculations on the grain market, initiated, conducted and financed deals for Rollestone; he evidently regarded Rollestone, possibly because of his bank connection, as a valuable man for his purposes; and it is clearly inferable that instead of paying him for his services he secured them by keeping before Rollestone an ever-present lure of large speculative profits about to be realized. In view of the particular services rendered by Rollestone in helping secure the 600,000 shares and in financing the deal, it would be a matter of no surprise that Milliken offered to let him share in a small way in the adventure. All the circumstances considered, we do not regard it as inherently improbable that Milliken, pursuant to an understanding with Rollestone, was "carrying" the latter for 10,000 shares of the stock, and that he so declared, as testified by McDonald.

III. (1) Appellants abandon here their pleaded defenses of the Statutes of Limitation. The only question that remains to be considered is that of laches. It is said that Milliken by ignoring Boughton's letter of

October 1, 1912, repudiated the alleged trust; that there-
after plaintiff stood by and silently acquiesced
in Milliken's drawing and appropriating the
dividends and made no demand for an accounting, even
when the stock was sold in 1915, but waited four years
longer and until after Milliken's lips were closed by
death. It is insisted that there was no excuse for plain-
tiff's failure to assert his alleged right during the life-
time of Milliken, and for that reason he should be pre-
cluded from doing so now.

Laches.

We do not regard Milliken's silence after the re-
ceipt of Boughton's letter as a repudiation of the trust
asserted therein; it cannot at least be considered such
an unequivocal repudiation as to have required immed-
iate action on the part of Rollestone unless he intended
to abandon his claim. It was no doubt Milliken's pur-
pose, in any event, to retain control of the stock until
such time as he could dispose of his entire holding, on
the theory that a more advantageous sale could be ef-
fected in that way. Such plan was evidently within the
contemplation of both parties when the 600,000 shares
were acquired and 10,000 of them alloted to Rollestone
by reading of Boughton's letter, with its recitals of cir-
cumstances which are therein asserted to give rise to a
trust, shows that its real purpose was to obtain from
Milliken an express acknowledgment in some form of
Rollestone's ownership of the stock rather than to se-
cure a delivery of it. It threatened suit only if Milliken
denied the rights therein claimed on behalf of Rolle-
stone, and this he did not do. Failing to get any further
acknowledgment from Milliken, Rollestone quit the coun-
try to seek a livelihood elsewhere. He went to Europe
and thence to South Africa; after remaining at the
latter place a year or more he returned and enlisted in
the activities of the oil fields of Oklahoma. It does not
appear when he learned of the sale of the stock or of
Milliken's death.

Laches in legal significance, is not mere delay, but
delay that works to the disadvantage of another. It is

not like limitation a mere matter of time, but is principally a question of the inequity of permitting a claim to be enforced, this inequity being founded on some change in the conditions or relations of the property or the parties. [O'Day v. Realty Co., 191 S. W. 41.] No such inequity would be involved in granting the relief sought in this case. The only change that occurred that could be said to have any material bearing on the situation was the death of Milliken. But the claim now pressed against his estate is precisely the same as the one that was presented to him in his lifetime. Its bona fides cannot be questioned and the proof offered in its support is clear and convincing. In this contest Milliken's death operates to put his estate at some disadvantage to be sure, but that is no reason for denying equitable relief against it when the right is clear.

We concur in the conclusions reached by the chancellor who heard the cause *nisi,* as to both the law and the facts. The judgment is accordingly affirmed. All concur.