Mrs. A. J. (Nell) GARDNER, Respondent,

v.

James H. BERNARD, Executor of the Estate
of Paul H. Gardner, Appellant.

Kay GARDNER, Respondent,

v.

James H. BERNARD, Executor of the Estate
of Paul H. Gardner, Appellant.

Albert F. GARDNER, Respondent,

v.

James H. BERNARD, Executor of the Estate
of Paul H. Gardner, Appellant.

Kay GARDNER as Next Friend of
Kathryn C. Gardner, Respondent,

v.

James H. BERNARD, Executor of the Estate
of Paul H. Gardner, Appellant.

Kay GARDNER as Next Friend for
Timothy F. Gardner, Respondent,

v.

James H. BERNARD, Executor of the Estate
of Paul H. Gardner, Appellant.

Nos. 51316–51320.

Supreme Court of Missouri,
Division No. 2.

March 14, 1966.

Rehearing Denied April 11, 1966.

Albert Thomson, Kansas City, Linde, Thomson, VanDyke, Fairchild & Langworthy, Kansas City, of counsel, for respondents.

Warren E. Slagle, Slagle & Bernard, Kansas City, for appellant.

EAGER, Presiding Judge.

This appeal involves five different suits, consolidated here for briefing and argument. Each case has its own transcript, but it was stipulated that the evidence in the Kathryn Gardner case would constitute a part of all records. Each suit seeks to enforce an "irrevocable trust account" against the estate of Paul H. Gardner, alleged to have been originally established at $3,000 in 1945, and invested in real estate mortgages. Defendant, in each case, denied the creation of any trust, and pleaded certain other defenses which are not preserved here. The essential issue is trust or no trust and, if any, what is due to any or all of the parties. The trial court, without any accounting as such, found for all plaintiffs and rendered a money judgment for each of three in the amount of $15,599.-64, and for two in the amount of $15,386.-00 each. Appeals were duly taken in all cases.

We shall attempt to clarify the confused and confusing details but do not anticipate a complete success in the endeavor. Paul H. Gardner died in 1963, a resident of Kansas City, Missouri. He had been married three times, the last in 1958, and twice divorced. His last wife, Lucille, and a previous wife, Betty, survived him. He had no children. The only blood relatives who survived Mr. Gardner were Albert F. Gardner of Los Angeles, a nephew, and his two children, Timothy and Kathy, who were 20 and 17, respectively, at the time of the death. Albert's wife was Kay Gardner; the widow of a brother, A. J. Gardner, also survived; she lived in Nebraska and she was usually referred to as Nell Gardner. Albert Gardner had lived in Los Angeles since 1937; beginning in 1939, Paul Gardner visited Al (generally so referred to) and his family every summer at their home, and in later years his last wife always came with him; these visits included 1962. The relationship between Mr. Gardner and Al's family was obviously rather close.

According to the testimony of Al Gardner (not admitted in his own case), his uncle Paul showed him an account book, identified as Exhibit 5, during the summer of 1945; this, Al said, was a "record of all his business transactions." Al further testified: that during 1945 Paul told him and his wife that "he was setting up trusts taking advantage of the $3,000 gift exclusion under the income tax law and that these were to be set aside for our future use"; that thereafter each year "until 1958" Paul, being proud of the growth of income shown in the book, took occasion to "show how these accounts had grown each year"; that Plaintiff's Exhibit 4 (also Exhibit 6, a duplicate) a page from the book, which was entitled "Mortgage Account— Kathy Gardner, Grand niece— * * * Invested 1st Mortgages," was referred to by Paul as reflecting "the growth of this trust fund * * * into 1956"; also, that Paul stated that interest checks after 1956 were being "siphoned off into separate accounts * * * to be used for the beneficiaries"; that Paul told him that the accounts were being limited to $9,800 in order to get away from the payment of income taxes on amounts over $600, but told him and his wife that the monies accruing each year "were to be put into similar accounts

* * * for the various beneficiaries." More specifically, Al testified that in the summer of 1946 Paul told him: that he "had established trusts in the name of Tim, Kathy, myself, my wife and my mother (Nell) in the amount of $3,000 each" in order to take advantage of gift tax rulings; that "these trusts were to accumulate for * * * each * * *, they were to be irrevocable trusts for our future use"; that "the gift was $3,000.00 which was to be allowed to accumulate to a total of approximately $10,000"; that the income was then to be funneled off into similar arrangements; also that he, Al, was aware that the principal was invested in mortgages which were being handled by a firm in Kansas City and that he had met one of the men handling the mortgages.

Kay Gardner, Al's wife, testified in less detail: that she knew Paul Gardner before she and Al were married in 1935; that he visited them every summer and had become "a part of our family"; that she had seen the account book, Plaintiff's Exhibit 5; that Paul had a desk in their home for the conduct of his business; that Paul said, in referring to the book, that "those were our trust funds" and that when the funds had reached "under $10,000 * * * the interest * * * would be placed for us to add additional funds * * *"; that Paul said that the trusts were for Al, herself, Tim, Kathy and Nell. Other testimony will be referred to in connection with certain exhibits.

The account book, Plaintiff's Exhibit 5, was not offered in evidence; certain pages were offered and received. There was no specific evidence as to the times or manner of its preparation but parts of it were shown to be in Paul's handwriting and, as already stated, it was shown to have been in his personal possession over a period of 17 years. It was also shown by exhibits received in evidence that at least as early as 1956 the firm of Reed and Tucker of Kansas City was handling the collection (and perhaps the purchase) of real estate notes and mortgages for Paul; that in June,

1960, the John J. Van Evera Company took over that function. Certain sheets from the records of each firm were received, over objection, listing various mortgages and the collections thereon for the years 1956–1962, inclusive; these sheets listed also checks issued from Paul's account to Al Gardner, Kay, Tim, Kathy, and Mrs. A. J. (Nell) in 1956 ($587.40 each), and thereafter four for 1957 and 1958 (omitting Nell) for $588 each, five in 1959, 1960 and 1961 (to all) for $588, with four only for 1962. The only evidence on the subject was that these checks were issued on instructions from Paul. Cancelled checks issued by these agencies were offered and received, in the amount of $588 per year to Al, Kay, Kathy, Tim and Nell from 1956–1961, inclusive (1956 was for $587.40) with 1962 checks to Kathy, Al and Tim, and 1963 checks issued (but with signatures torn off) to Kathy, Al and Tim. These checks were offered and received separately in the cases of the respective drawee-plaintiffs; generally, they conformed to the listings on the ledger sheets. The checks and ledger sheets were procured from the original records and files of the respective agencies; Mr. Reed, Mr. Tucker and Mr. Van Evera were all dead, as was Mr. Gardner. The President of the Van Evera Company specifically identified its ledger sheets and checks as parts of its regular business records. The records and checks of Reed and Tucker were found by Mrs. Reed, Executrix of Mr. Reed, among the business records and files of the firm and she turned them over upon request to Mr. Bernard, Executor of Paul Gardner, who had also been the attorney for Mrs. Reed as Executrix. There was evidence that the endorsements on the checks to Kathy, Tim, Al, Kay and Nell, beginning with 1959, were all in Paul's handwriting. All of the earlier checks were endorsed by the respective payees and returned to Paul.

Three checks of Al Gardner in 1956, 1957 and 1958, payable to P. H. Gardner, were introduced; these were in the respective amounts of $2,352.00, $2,352.00, and

$2,349.70; all were endorsed and deposited by Paul. Al testified that Paul told him that, beginning with 1956, it would be necessary to create new accounts "to escape paying income tax," and that these checks were given in exchange for checks delivered by Paul to him in the same amounts. Each of these checks of Al's bore a notation "Int. on Trusts Tim, Kathy Kay & Al." There was no evidence of any disposition by Paul of those monies, nor were there further conversations after 1958.

The President of the Van Evera Company, which took over the handling of the mortgages in June, 1960, testified that the notes and mortgages of Mr. Gardner handled by that company were not in any way segregated and that he said nothing to her about any trusts. She identified the checks issued to relatives at his specific directions. These mortgages were obviously the same ones or substitutes for those handled by the previous agency, Reed and Tucker. The checks issued to these plaintiffs bore no relation to the collection on any particular notes or group of notes, but came out of the general account.

Three exhibits, each entitled "Mortgage Account," bore the names of Kathy, Timothy and Albert Gardner. Exhibits 6, 34, 38. These were obviously in Paul's handwriting but there was no evidence showing the time or times of preparation, except perhaps for Al's generalizations about seeing the accounts in the book from time to time. Each of these sheets shows an entry of "12/31/45 Prin. 3,000," and additional entry of "12/31/47 Prin 3000," and sundry interest entries which apparently represent 6% interest compounded semi annually; each of the principal balances terminated with the sum of $9,800 on 12–31–55, completed by an addition of $154.94 to principal. Thereafter interest of $588 was shown in each year as credited and *withdrawn,* leaving the last balance (still) $9,800 in 1962. Another Exhibit, No. 7, was entitled "Total Mortgage Accounts—Al & family—including Nell," but the notation below that was: "Gift & Int. Acct." The first entry was "1945 15000 (5) 3000 gifts"; an interest entry appears for 1946 at 6% compounded semi annually; for 1947 appears "15969.15 (5) 3000 gifts + Int"; from 1948–1960, inclusive, interest entries appear, with *Payments* also appearing from 1955–1960, inclusive, in equivalent amounts (with one minor exception), generally $2,940. At that point the balance carried was $49,000. In "Jan. 61" under "Paid" appears the figure $19,600 to "Kay & Mrs. A. J." with a final terminal balance thereafter and in 1962 of $28,400. The meaning of this exhibit is not too clear.

Purported copies of income tax returns of Paul from 1956 to 1962, inclusive, were received, together with certain work sheets, as was also the testimony of an accountant who had reviewed these papers. All had been found in Paul's records and files and were produced, on subpoena, by his Executor. The net result of this evidence was that Paul had shown on his work sheets for those years substantial amounts of the total interest received as "applied to others" and had made no return of those amounts. These sums included $588 per year for each of such years as supposedly applied to each of the following,—Al, Kathy, Kay, Tim and Nell, except that Kay and Nell were omitted in 1962. This accountant had also checked the records of the two agencies who had handled Paul's notes and mortgages. No record was found of any information returns filed by Paul as Trustee for any of the parties involved.

In a letter to Nell (Mrs. A. J. Gardner) of March 19, 1958, Paul stated, in part: "Im busy trying to get away for Calif. this coming Friday. Some years ago I set up some trusts to cut down inheritance taxes in the event of my death. You were included among them, and since they have now reached a certain amount, annual interest checks must be drawn to avoid Income Tax which applies only on income of $600 or more per year. So will you please deposit this check to your account and send me your personal check for the same amount."

■ A "Financial Statement" being a page from Paul's account book, was offered and received in the Kay, Al and Tim Gardner cases, as Exhibit 32. Under date of "Jan 1, 1963," it listed various assets and among the liabilities listed appeared the following: "Al & Kay 9800, Tim $9800, Kathy $9800." In Paul's will, executed on June 29, 1961, there appeared the following in Article III: "Over a period of many years I have been investing the funds of certain of my friends and relatives in real estate first mortgages, and it is my desire that any funds of theirs which I still have at the date of my death, be returned to them as promptly as possible. As of the date of this instrument I have funds of the following persons in the following amounts:

\*　　\*　　\*　　\*　　\*　　\*

| | |
|---|---|
| Albert F. and Kay Gardner | 9,800.00 |
| Timothy Gardner | 9,800.00 |
| Kathy Gardner | 9,800.00" |

After certain bequests, the residue of his estate was left in a trust concurrently and separately established, the terms of which do not appear. We conclude that Plaintiffs' Exhibit 22, a letter from Novus Reed to Paul, dated December 20, 1955, and certain notations on the backs of files supposedly kept by Reed or Reed and Tucker, were hearsay and inadmissible. In so far as they might be material, no authorization of Gardner was shown to make them admissible as against his interest. We further conclude that the exhibits found by the defendant Executor in the files and records of Paul Gardner were admissible; some of these were parts of the book identified by Al Gardner as a record continuously in Paul's possession; the copies of income tax returns were obviously the best evidence available to the plaintiffs, for only the defendant could procure the originals. The longhand work sheets appear to have been corroboratory of the returns. The exhibits constituting ledger sheets and checks of Reed and Tucker and of the Van Evera Company were fairly admissible as business records under all the circumstances. Reed

and Tucker were both deceased, and the identification of the records was obviously the best available under the circumstances. There has been no suggestion of any impropriety in connection with any of the records. All are to be considered merely for what they may be worth.

The inventory of Paul's estate listed property appraised at approximately $359,000. We note: that Paul, from 1945 to 1955, apparently added the supposed interest to principal on his respective "mortgage accounts" until each reached a total of $9,800; from 1956 to 1958, inclusive, he issued checks for "interest" but had the beneficiaries endorse and return them, thus showing an interest accrual but also an equivalent payment or withdrawal (described both ways in different documents) for each year. The greatest balance carried on any such individual account at any time was $9,800. From 1959 on, such checks as were issued were endorsed by Paul himself with no accounting, except that he continued to show "interest" accruals in his three "mortgage" accounts to and including 1962, but with corresponding withdrawals or payments. None of the withdrawals or payments shown from 1955 on appear to have reached the beneficiaries, nor was any other disposition shown. We can only assume that Paul retained and used that money as a part of his general funds and did not actually include it in any trust or trusts.

■ The theory of the petitions and of plaintiffs at the trial was that Paul had established five trusts of $3,000 each by his oral declarations and that he had corroborated his acts and declarations by exhibiting his accounts showing the investment of such funds as trustee; in Respondents' brief here it is stated (p. 41) that deceased declared himself "trustee for $3000 of first mortgages," and again (p. 55) that he desired to set up trusts "composed of an undivided interest in those notes and mortgages." It was not specifically shown that Gardner owned any notes or mortgages in 1945. The theories, as well as the evi-

dence, are somewhat confusing. However, "[i]f the facts alleged in equity justify the court in declaring a trust on any theory, the petition must be considered sufficient." Swon v. Huddleston, Mo., 282 S.W.2d 18, 55 A.L.R.2d 205. Concerning the exhibits, we note that acts and entries of a trustor done or made subsequent to the supposed creation of a trust may be considered as indications of his intent. Harding v. St. Louis Union Trust Co., 276 Mo. 136, 207 S.W. 68; St. Louis Uniformed Firemen's Credit Union v. Haley, Mo.App., 190 S.W.2d 636.

■ There is no doubt that one may establish an oral, voluntary trust in personal property, and that he may constitute himself as the trustee. However, the intent must be clearly expressed by words or conduct or both, enforceable duties must be thus imposed, the trust must be presently created, and the object of the trust must be property in existence, ascertained or ascertainable; the declaration need not be in any particular form. Scott on Trusts, 2nd Ed., Vol. 1, §§ 17, 23, 24, 26; Bogert, Trusts & Trustees, 2nd Ed., §§ 45, 46, 50, 111; Restatement of the Law, Second, Trusts, §§ 2, 17, 23, 24; Bingen v. First Trust Co. of St. Paul (CA 8), 103 F.2d 260; Eldridge v. Logan, Mo.App., 217 S.W.2d 588; Rollestone v. National Bank of Commerce in St. Louis, 299 Mo. 57, 252 S.W. 394; Watson v. Payne, 143 Mo.App. 721, 128 S.W. 238; Harris Banking Co. v. Miller, 190 Mo. 640, 89 S.W. 629, 1 L.R.A.,N.S., 790; Korompilos v. Tompras, Mo.App., 251 S.W. 80; St. Louis Uniformed Firemen's Credit Union v. Haley, Mo.App., 190 S.W.2d 636. If a trust is presently created, the enjoyment may be postponed. See the authorities just cited. In true legal theory, the terms of the trust should be stated, but in many of the adjudicated cases the terms are actually developed wholly or in part by the subsequent acts and conduct of the trustor. There must be a trust res, or corpus, but it has been held that an undivided interest in money or homogenous property will suffice. Rollestone, supra; United States

Trust Co. of New York v. Commissioner of Internal Revenue, 296 U.S. 481, 56 S.Ct. 329, 80 L.Ed. 340. Scott, supra, § 76. Thus, we all know that enormous amounts of money are held in investment trusts and pension trusts where each beneficiary merely owns an undivided equitable interest in the total assets—money and property. Any trust may be revocable or irrevocable, according to the intent expressed by the trustor in his words or by his conduct.

■ We have determined that certain trusts were established by Mr. Gardner, as we shall indicate later. His statements to his nephew in 1945 and 1946 were sufficient to constitute a present declaration and creation of the trusts, for all practical purposes, although he did not pinpoint the exact time of their creation. The declarations were substantially contemporaneous with the act of creation; the amount of each trust was designated, the trust beneficiaries were named. While Al Gardner testified that the trusts were stated to be "irrevocable," we have determined from Mr. Gardner's acts and conduct that it was his intention that they should be revocable. The circumstances may evidence the intent to make such a trust revocable. Restatement of Trusts, Second, § 330. The trusts, as thus established, were of $3,000 each, subject to such additions as the trustor might make in the future by way of principal or interest; they were not, and could not have been trusts of an undivided interest in notes and mortgages for it was not shown that he then owned any. The investment of the money in such securities, along with his general funds, did not change the essential nature of the trust. We shall discuss later the sufficiency of the evidence to create a trust for Albert Gardner, but in the meantime discuss all jointly.

In reaching these conclusions we have considered: that these five plaintiffs were natural objects of Mr. Gardner's bounty, and that three of them were his only blood relatives; that, while such is not conclusive, he frequently referred to these relationships

as trusts, although he was not entirely consistent in his record keeping; that he received and deposited Al's checks showing notations of interest on "Trusts"; that he specifically referred to the trusts in his letter to Nell; that he frequently showed the accounts, with their accumulations, to Al and his wife; that, so far as the record shows, he did not pay any income tax on the supposed income from these accounts (although, contrariwise, he made no information returns); that his own records specifically showed the allocation to Al, Kathy and Tim in separate "mortgage" accounts of $3,000 in 1945 and the additions of principal sums later, namely, $3,000 in 1947 and $154.94 in 1955; that his record of "Total Mortgage Accounts" included "Al & family, including Nell," and listed sums of five times the individual accounts; and that he recognized in his will, though somewhat inconsistently, the existence of three funds of $9,800 each, as being in his possession but which did not belong to him.

 The statement in Respondents' brief that the interest rate of 6% "was fixed by the terms of the trust" shows a certain lack of appreciation of the basic nature of a trust; ordinarily, trust income is merely the net amount which the corpus of the trust actually *earns*. In this matter Paul adopted an unusual method of allocating income; he did allow 6%, compounded semi-annually, to each trust with no consideration of commissions or other expense; however, that was his own method of allowance of income and his estate is bound by it; he, as trustee, did not "owe" any such sums, but he could increase the trust as he saw fit. In this manner, according to his own records, he allowed the separate trusts to increase to a total of $9,800 each as of the end of 1955. After that date he added *nothing*, either as interest or principal, nor did he set up any new accounts or trusts with the income as (according to Al) he told the beneficiaries he would do. In this respect his actions "spoke louder than his words." And the termination of each trust as a matter of record at

$9,800 is one indication, and perhaps the strongest indication, that it had been and was his intent to create revocable trusts and to retain control over the amounts, the accruals and the cutoff date. After 1955 Paul showed in his records the withdrawal or payment of all interest accumulations; we could only speculate as to his intentions in continuing to show the accrual of interest, and we shall not speculate. The fact remains that he *never paid any beneficiary anything, and he never showed, on his record, any balance in any trust of more than $9,800*. He did not exhibit any of the accounts to his nephew after 1958. If he could revoke the trusts he could limit the corpus to any desired amount (above $3,000) and he did so, at $9,800; and likewise he could cut off all further accruals and he did that. We conclude that no trust exceeded $9,800 at any time and that no beneficiary is entitled to any interest on that amount or to any accruals whatever beyond that amount. The retention of a right on the part of the trustor to retain and use all or part of the income does not, in and of itself, invalidate a trust. In re Soulard's Estate, 141 Mo. 642, 43 S.W. 617; Harris Banking Co. v. Miller, 190 Mo. 640, 89 S.W. 629; and such a right is merely an incident of the total right to revoke a revocable trust.

We next consider whether any such trust has been established for the benefit of Al Gardner, for his own testimony was excluded in that case, upon objection. The records and exhibits are available to him, however, and one of the individual "mortgage" accounts was kept in his name. His wife, Kay, testified: that Paul Gardner showed her the account book, that the books and accounts lay "there on the desk," and that he told them that "those were our trust funds"; that he referred specifically to the time when the "trust funds" would reach an amount "under $10,000" and discussed the procedure to be followed then; that he said that "these funds" would grow and benefit "those named in our family"; that he also said that the trusts were for

Al, Tim, Kathy, Kay and Mrs. Nell Gardner. We conclude that such evidence, along with the various exhibits, was sufficient to establish a trust in favor of Albert Gardner to the extent already noted.

■ There is some indication that prior to Mr. Gardner's death he treated the trusts for Kay and Nell in a somewhat different manner than he did the others. These indications were, as already stated: that in his sheet of "Total Mortgage Accounts" he showed, as of January, 1961, $19,600 as "Paid" to "Kay and Mrs. A. J." and thereafter carried a total balance of $28,400 in lieu of the previous balance of $49,000. Of course, no such payment was made (incidentally, his arithmetic was wrong, and the balance should have been $29,400). In his financial statement of January, 1963, and in his will he showed, respectively, "liabilities" and funds due others of $9,800 to Al and Kay and $9,800 each to Kathy and Tim. He continued, however, to *issue* checks to Kay and Nell through 1961, although retaining the money. The meaning of this conduct on his part was ambiguous, and we do not find that these records are sufficient to indicate an intent to revoke those trusts. We hold that trusts for these two beneficiaries existed at his death to the extent stated.

■ We have not lost sight of the oft declared rule that the evidence to establish a trust must be cogent, clear and convincing, and that ordinarily it should dispel all doubt. Northrip v. Burge, 255 Mo. 641, 164 S.W. 584; Van Studdiford v. Randolph, Mo.App., 49 S.W.2d 250; Harding v. St. Louis Union Trust Co., 276 Mo. 136, 207 S.W. 68. But an oral trust is rarely, if ever, declared in words of technical and legally definitive meaning; the rule means essentially that, after considering all the evidence, oral and documentary, the court must be completely and fully convinced that a trust was created. We are so convinced here, and it is not essential that "any particular form be followed, or that the words 'trust' or 'trustee' or their equivalent be used." St. Louis Uniformed Firemen's Credit Union v. Haley, Mo.App., 190 S.W.2d at loc. cit. 639. The sufficiency of the evidence here compares favorably with that held to be sufficient in Rollestone v. National Bank of Commerce in St. Louis, 299 Mo. 57, 252 S.W. 394.

■ Here, as in any case tried to the court, we make our own findings. Civil Rule 73.01(c). We do not agree with some of the findings of the trial court. We have already indicated what the findings and conclusions should be but, to be perhaps tediously specific, we find: that in 1945 Paul H. Gardner created and established revocable trusts for the benefit, separately, of each of these five plaintiffs; that the original principal amount of each of said trusts was $3,000; that by accumulations and voluntary additions thereto each of such trusts was increased to a principal amount of $9,800 as of the end of 1955; that no further sums accrued thereon or thereto, and that the total sum to which each of the plaintiffs is entitled is $9,800. We conclude that each of the five plaintiffs in these actions is entitled to recover $9,800 of and from the defendant.

The judgment and decree of the trial court is reversed, with directions to enter a new judgment in accordance with the views stated in this opinion.

All of the Judges concur.